IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

- - - - - - - - - - - - - -

SCOTT CLEWS,                      CIVIL ACTION - LAW
JOSEPH S. POTHERING and
DEBRA M. DETWEILER,
              Plaintiffs

    vs.                          CASE NO: 3:17-cv-02233

COUNTY OF SCHUYLKILL,            (JUDGE CAPUTO)
              Defendant          JURY TRIAL DEMANDED

- - - - - - - - - - - - - -/


Deposition of:   DEBRA M. DETWEILER

Taken by    :   Defendant

Date        :   June 24, 2019, 12:44 p.m.

Place       :   Law Offices of Edward M. Brennan
                306 Mahantongo Street
                Pottsville, Pennsylvania

Reporter    :   Susan L. Henderson
                Registered Professional Reporter
                Notary Public

EXHIBIT

3

APPEARANCES:

LAW OFFICES OF EDWARD M. BRENNAN
By:  EDWARD M. BRENNAN, ESQ.
     Appearing on behalf of the Plaintiffs

THOMAS, THOMAS & HAFER, LLP
By:  CHRISTOPHER L. SCOTT, ESQ.
     Appearing on behalf of the Defendant

ALSO PRESENT:

COUNTY OF SCHUYLKILL
By:  GLENN T. ROTH, JR., ESQ.
FIRST ASSISTANT SOLICITOR/RISK MANAGER


SCOTT P. CLEWS

JOSEPH S. POTHERING

INDEX TO WITNESS

DEBRA DETWEILER                          Examination

  By Mr. Scott                                4

INDEX TO EXHIBITS

Detweiler Deposition                          Marked
Exhibit Number

1.   Handwritten Personal Log of              19
     Deb Detweiler

2.   Deb Detweiler worksheet                  25

3.   Document with title, "Additional         42
     Deputies that were Assigned to Me
     Only to Perform:  Morgue Process"

STIPULATION

It is hereby stipulated by and between counsel for the respective parties that sealing, certification and filing are hereby waived; and all objections except as to the form of the question are reserved to the time of trial.

DEBRA M. DETWEILER,

called as a witness, having been duly sworn,

testified as follows:

EXAMINATION

BY MR. SCOTT:

Q.   Good afternoon, Ms. Detweiler.

A.   Good afternoon.

Q.   You've been sitting here for a while.  We'll try not to belabor the point, but I do have a couple of questions to ask for you.  You sat in on the prior depositions and you heard all the instructions previously.  Right?

A.   Correct.

Q.   You know to answer verbally.  Right?

A.   Yes.

Q.   No head nodding or um-hum, um-um.  Right?

A.   Correct.

Q.   And we'll do our best to not talk over each

5

1    other.

2        A.    Okay.

3        Q.    Is there any reason that you would not be

4    able to give true, full, and well thought-out answers?

5        A.    No.

6        Q.    Are you taking -- have you taken any drugs,

7    alcohol, or any other substances which would impair

8    your ability to understand what's happening today?

9        A.    No.

10       Q.    Don't guess.  Approximations are okay.  We're

11   cool with that?

12       A.    Yes.

13       Q.    All right.  Very good.  Can you give your

14   full name for the record?

15       A.    Debra Marie Detweiler.

16       Q.    And what's your home address?

17       A.    61 Hemlock Lane in Orwigsburg, Pennsylvania.

18       Q.    And what's your highest level of education?

19       A.    High school diploma.

20       Q.    And where did you graduate?

21       A.    Schuylkill Haven Area High School.

22       Q.    What year?

23       A.    1990.

24       Q.    How about education?  Any education or

25   certifications beyond high school?

1      A.    LPN program, Schuylkill Training and

2    Technology Center.

3      Q.    And when did you do that?

4      A.    1990.  I did not complete the program.

5      Q.    Any others?

6      A.    Certified nursing assistant.

7      Q.    When?

8      A.    That would have been around 1990 as well.

9      Q.    Where did you go to maintain that

10   certification?

11     A.    That was done through the Leader Nursing Home

12   at the time.

13     Q.    Did you get that certification?

14     A.    Yes.

15     Q.    Any other certifications?

16     A.    Emergency medical technician, 1989.  And I

17   held that for about 20 years, about 21 years.

18     Q.    So in approximately 2010, you dropped that?

19     A.    Roughly.  And then the basic death

20   investigator.

21     Q.    You say basic death investigator?

22     A.    It's a basic death investigation course.

23     Q.    Is it a course?

24     A.    Correct, through the state.

25     Q.    Is there anything -- well, I'll get to this

1    later.  I'll come back around to that.  Strike that.

2         Who is your current employer?

3    A.   Schuylkill County.

4    Q.   And in what capacity are you employed in

5    Schuylkill County?

6    A.   I'm a certified field appraiser and a deputy

7    coroner.

8    Q.   So you're a certified field appraiser.  Let's

9    talk about that briefly and get that out of the way.

10   What do you do as part of that job?

11   A.   My job is to -- we're assigned several areas

12   throughout the county.  I believe I have 14.  So my

13   job is to go out and follow up permits for any type of

14   new construction, additions, that have been added onto

15   the property, place them onto the tax roles for tax

16   purposes.

17   Q.   Do you have hours for that job?

18   A.   Yes.

19   Q.   How many hours a week?

20   A.   35.

21   Q.   Every week?

22   A.   Every week.

23   Q.   Do you have overtime with that job?

24   A.   No.

25   Q.   And how long have you been doing that

1    position?

2        A.    I was a 911 dispatcher initially first for

3    the first eight years and then I transferred to the

4    Tax Assessment Office.

5        Q.    Do you remember when you went to the 911?

6        A.    I started at the 911 Center September 20th,

7    1993, and I continued there for seven years and then

8    transferred to the Tax Assessment Office.

9        Q.    So that would be around 2000?

10       A.    Yeah, roughly.

11       Q.    And in your other capacity as deputy coroner,

12   how long have you been employed in that capacity?

13       A.    In June, it will be five years.

14       Q.    So if my math is correct, you started in

15   2014?

16       A.    Correct.    I don't have the exact date in

17   June, but it was in June.

18       Q.    Who hired you?

19       A.    Dr. Moylan.

20       Q.    How did you come to Dr. Moylan's attention

21   for being interested in a job?

22       A.    Through Joseph Pothering.

23       Q.    And how did that work where Dr. Moylan got

24   the information through Joe Pothering?  How did that

25   work?

1    A.    I expressed interest in the deputy coroner

2  work, and I believe Joseph Pothering had a

3  conversation with Dr. Moylan, and then subsequently a

4  time was set up for me to go meet Dr. Moylan.

5    Q.    And then you were hired by Dr. Moylan?

6    A.    That's correct.

7    Q.    And what were the -- what were the terms of

8  your hiring when you were hired?

9    A.    Initially in the first time I met Dr. Moylan,

10  I guess you would call that like an interview, a

11  little bit of an interview.  He asked me my

12  background.

13        From there, he said that I could shadow a

14  minimum of five calls with Joseph Pothering, and after

15  that he would then talk to me to see if it was

16  something that I definitely was interested and wanted

17  to do.

18    Q.    And was it?

19    A.    Yes.

20    Q.    And then when he decided to take you on

21  beyond just the shadowing, did he set forth a term of

22  how much you were going to be working?

23    A.    No, he did not, just on an on-call basis.  My

24  understanding at the time was they would dispatch the

25  closest most available deputy within 20 minutes of

1  your home, so where you lived.

2      Q.   So it was set up -- to your understanding, it

3  was set up somewhat geographically?

4      A.   Correct.

5      Q.   And then you're saying "on call." And I know

6  we talked about it in other depositions, an on-call

7  situation that happened over a period or a month or

8  two months. Are you referring to the same on-call

9  situation or are you talking about a different type of

10 on call?

11     A.   No, just -- they would call you if a call

12 would come in. It wasn't like the other incidents

13 that you're talking about.

14     Q.   Okay.

15     A.   This was just if a call came into your area,

16 they would call you to see if you were available to

17 take the call.

18     Q.   And if you didn't happen to be available,

19 were there any consequences?

20     A.   No.

21     Q.   Around the time of your hire, do you know how

22 many other deputy coroners there were?

23     A.   I think there could have been 20 at the time.

24 There was quite a few. I know that. There was quite

25 a few on his list. However, he said that he didn't

1    always use all of them, was my understanding.

2        Q.    Before I forget, just let me make sure I

3    exhaust the question.  Currently, are you employed

4    anywhere else other than Schuylkill County?

5        A.    Yes.

6        Q.    Where are you employed?

7        A.    Berks County Coroner's Office.

8        Q.    Okay.  And when did you start working for

9    them?

10       A.    Two years ago.

11       Q.    And how did you come to their attention?

12       A.    They were looking for deputy coroners, for

13   part-time deputy coroners, and subsequently I applied

14   for the position.

15       Q.    I understand that you're part of a union here

16   in Schuylkill County?

17       A.    That's correct.

18       Q.    Are they part of the same union as Berks

19   County?

20       A.    No.  It is AFSCME, but it's a different

21   local, I believe.

22       Q.    So you've only worked under Dr. Moylan and

23   Dr. Weber.  Is that right?

24       A.    Correct.

25       Q.    So we could agree that Dr. Moylan and

12

1    Dr. Weber are your supervisors.  Correct?

2         A.    That's correct.

3         Q.    You don't report to anyone else?

4         A.    That's correct.

5         Q.    We heard it from the other two.  Can you

6    describe your job duties?

7         A.    You'd be notified of a death call.  Of

8    course, you would respond to the scene.  You would

9    investigate the death, the surroundings, the

10   circumstances.  You would interact with law

11   enforcement, the EMS personnel, whomever is there.

12   And then ultimately you would contact either

13   Dr. Moylan or Dr. Weber and advise of your findings.

14        Q.    And who would be the person that contacted

15   you regarding the notification of the death?

16        A.    Initially, it was Dr. Weber and Dr. Moylan.

17        Q.    How closely did you work with Dr. Moylan --

18   or how closely have you worked with Dr. Moylan?

19        A.    Very close.

20        Q.    How often do you interact with him?

21        A.    Now or then?

22        Q.    Let's break it down.  Let's start in -- from

23   2014 through 2017.

24        A.    Through 2014 through 2015, it was minimal

25   quite a bit.  But then from 2015 and '16 into '17, it

1  was very close.  We worked very close together.

2       Q.   Okay.  And how about since 2017?

3       A.   We rarely speak.

4       Q.   He still directs your work, though?

5       A.   That's correct.

6       Q.   And when you go out to a crime scene, do you

7  have specific attire that you are required to wear as

8  part of the Coroner's Office?

9       A.   It was never really specified what we were to

10 wear as long as we were presentable and to make

11 yourself presentable because you were representing the

12 county.

13      Q.   You had to identify yourself as working for

14 the coroner's as part of any -- going to a crime

15 scene.  Correct?

16      A.   That's correct.

17      Q.   Were you ever told from Dr. Moylan that you

18 represented the office of the coroner to the public?

19      A.   Yes.

20      Q.   Why don't you tell me in your own words why

21 you filed this lawsuit against Schuylkill County.

22      A.   I put a very large amount and great deal of

23 time into the Coroner's Office.  And where I was made

24 aware that the overtime laws should have applied to

25 myself and I should have been compensated for it

1  accordingly, it was at that time I then decided that

2  that was the right thing to do.

3      Q.  When were you made aware of that?

4      A.  It probably would have been maybe a year

5  prior to, I guess, the paperwork being filed.  It

6  wasn't something that I was even aware of.

7          Even though I worked for the county, I didn't

8  realize that the hours were accumulated between both

9  offices.  I actually thought -- the Coroner's Office I

10  was under 40 hours, and the real estate office I was

11  under 40 hours.  I never realized that it was an

12  accumulation of all the hours since it was one

13  employer.  So once I was made aware of that, then.

14      Q.  So why don't you tell me how you documented

15  your time for the county that was submitted for

16  payroll.

17      A.  Initially, if we got a call, that there was,

18  I believe, two different pay sheets over the time I

19  was in the Coroner's Office.  So the one pay sheet,

20  you would need to list the name, the address, the

21  location where you were at.  And then I believe in the

22  beginning it was $45 an hour.  You were given mileage

23  and so much per photograph.

24          And then along the way, it changed where it

25  was a flat $50 for the first three hours.  I believe

1  autopsies were listed on there as well and

2  transportation.  So you would fill out that form

3  specifically.

4      Q.  So there was a flat rate call call-out --

5      A.  Correct.

6      Q.  -- of three hours.  Is that right?

7      A.  Correct.

8      Q.  And you were to document the time you spent

9  out at the scene no matter whether it was above or

10  below three hours.  Correct?

11      A.  My understanding was that flat rate covered

12  the first three hours.

13      Q.  Okay.  And -- but there was a place on the

14  sheets to document time spent in excess of three

15  hours.  Correct?

16      A.  That's correct.

17      Q.  And did you document all that time spent in

18  excess of three hours?

19      A.  If it was involving an on-scene

20  investigation.

21      Q.  Okay.  When would you not note time on the

22  sheet?

23      A.  Any telephone calls, reports, delivering

24  death certificates.  Sometimes even follow-up

25  interviews.

1     Q.   Now, you say delivering death certificates,

2  and we talked about that in the prior depositions,

3  that there were -- now, there are, I guess, electronic

4  means to be able to do that, but previous to that, you

5  had to actually deliver it physically.  Is that

6  correct?

7     A.   That's correct.

8     Q.   There were -- there was a pay scale for

9  delivering a body, but not for delivering a death

10  certificate.  Is that accurate?

11     A.   That's accurate.

12     Q.   Okay.  And how much was it for transporting a

13  body?

14     A.   If you were transporting it in your personal

15  vehicle, I believe it was $80.

16     Q.   How much time did a typical on-scene

17  investigation take?

18     A.   It would really depend upon what the case

19  was.  If it was a natural death, I would say probably,

20  on average, two and a half to three hours would be

21  pretty accurate.

22     Q.   Beyond that on-scene two to three hours, what

23  additional time would be required of the deputy

24  coroner associated with that case?

25     A.   Again, if it's a natural death -- a natural

1  death itself, any follow-up phone calls to the family

2  that needed to be done.  If there was any additional

3  testing that was completed, reporting back to the

4  family and letting them know those things were done.

5  Contact to the funeral home and law enforcement, too,

6  as well depending on what was performed, just so

7  everyone was on the same page, so the communication

8  was there.  If it's a natural death, that would pretty

9  much be what you would need to do.

10      Q.    What other types of activities that we

11  haven't addressed would you do as a deputy coroner

12  investigation?  Anything else?  Whether it's natural,

13  whether it's homicide.

14      A.    Oh, all round?  I know for me, I know I was

15  in charge of drawing all the toxicology on any kind of

16  cases that toxicology needed to be drawn.  So that

17  would be drawing your vitreous, your urine, and your

18  blood, packaging it, and shipping it.

19          We would attend virtual autopsies or the

20  virtual scans as well.  I was designated as the

21  autopsy -- person in charge of the autopsy and the

22  morgue, setting up, facilitating, and making sure that

23  that was -- everything was in place for that.

24          Police liaison.  So I was the middle person

25  between all of the law enforcement officers in the

1  county and things that they needed for their cases.

2      Q.  Ms. Detweiler, you provided your attorney and

3  it was subsequently provided to us -- or, actually,

4  I'm sorry, you didn't provide it to your attorney, I

5  think it came through your work -- a log of all the

6  times that you were working during the year 2016.  Is

7  that right?

8      A.  For the whole entire year of '16?

9      Q.  I'm sorry, for a period of time in 2016.

10      A.  For a period of time, that's correct.

11      Q.  Between August '16 and October '16.  Right?

12      A.  Correct.

13      Q.  I'm not going to belabor every single entry,

14  like I forced Mr. Pothering to go through, but what I

15  am going to do is I'm going to focus on these entries

16  and the times that are listed for each one of those

17  entries.  So they're listed by date.  Correct?

18      A.  Correct.

19      Q.  And the date that we're -- that's listed on

20  the left-hand side, is that the date of death?

21          MR. BRENNAN:  Can we refer to this -- did you

22  mark this as an exhibit?  I think for the

23  transcript --

24          MR. SCOTT:  I did and I think we should.

25          MR. BRENNAN:  Yeah.

1      MR. SCOTT:  It's going to be Detweiler 1 --

2  or Detweiler -- yeah, I didn't put the dep notice in,

3  so this will be Detweiler 1.

4      (Detweiler Deposition Exhibit Number 1 produced

5  and marked for identification.)

6  BY MR. SCOTT:

7      Q.    Let me back up for a second.

8      A.    Sure.

9      Q.    Did you create this log?

10     A.    Yes.

11     Q.    All right.  And this is your handwriting?

12     A.    Yes.

13     Q.    All right.  So with that all set forth, I

14  want to ask you a few questions about the log itself.

15  The dates that are listed on the left-hand side of the

16  page for each one of these entries, is that the date

17  of death for these particular investigations that you

18  were dealing with?

19     A.    I believe.

20     Q.    And the amount of time that's listed on the

21  right-hand side, there's notations for one hour, five

22  hours, two hours, et cetera.  That's the total amount

23  of time that you spent on each one of those

24  investigations?

25     A.    That would have been the total amount of time

1    that I put on my pay sheet.

2        Q.   Okay.  For what reason did you create this

3    personal log?

4        A.   Because Dr. Moylan directed me to create the

5    log.

6        Q.   Okay.

7        A.   He asked us to -- he asked myself and Joe

8    Pothering to create a separate log and keep track of

9    everything that we were doing as far as each call that

10   we were taking.

11       Q.   Okay.

12       A.   So that he would have an accurate record of

13   that.

14       Q.   Okay.  And this was only for a period of two

15   months?

16       A.   Correct.

17       Q.   Was this personal log that you have right in

18   front of you different than what you were submitting

19   to payroll during that period of time between 8/16 and

20   10/16?

21       A.   These would have been the people that I would

22   have submitted.  I don't believe there were hours on

23   those time sheets, if I recall.  It was name, address,

24   location, what the call was.

25       Q.   But you had a timecard at that time, though.

1   Correct?

2       A.   No.   They were regular pay sheets.

3       Q.   Then how did you submit your time to get

4   paid?

5       A.   I filled out the pay sheet and submitted it

6   to the secretary.

7       Q.   Okay.  But there was -- we had gone over this

8   before, that there was a period -- there was -- on

9   each one of the sheets, there was a notation for how

10  much time was spent on the investigation and then

11  there was a notation for additional time.  Is that

12  correct?

13      A.   Oh, is that what you're talking about?  I'm

14  sorry.

15      Q.   Yes.

16      A.   I misunderstood.  Oh, yeah, if that was on

17  there, yes, I would have -- I would have filled that

18  out.  Initially, we did not have to list times and

19  then that came subsequently later on down the road.

20      Q.   Okay.  But this would have been the total --

21  the listing of times on these sheets would have been

22  the total time spent on scene?

23      A.   Correct.

24      Q.   All right.  You did not document in your

25  personal log here any times that were not spent on

1  scene on cases?

2      A.   No, I did not.

3      Q.   And why is that?

4      A.   I didn't really think -- it was irrelevant.

5  He was talking about specifically the call itself that

6  he wanted us to keep track of.

7      Q.   Okay.  So you don't have any documentation

8  even from your own personal logs of times spent on

9  investigations off of scene?

10     A.   Well, I'm sure we could easily pull my

11 e-mails and things like that, for reports or cell

12 phone records from when I spoke with law enforcement

13 or funeral homes and those kinds of things, but.

14     Q.   But you don't have any of that right now?

15     A.   No, I do not have that with me.

16     Q.   At any point, did Dr. Moylan direct you to

17 not record time spent working in excess of three hours

18 on each call-out?

19     A.   As far as?

20     Q.   Did he ever tell you to not record time in

21 excess of three hours for a call-out?

22     A.   There were certain things.  Delivering death

23 certificates, we were not to put that down and charge

24 for that.  Additional calls to the family.

25          Again, to him, that was considered part of

1  the call.  That was your -- you were already paid for

2  that.

3      Q.   Okay.  But he -- did he ever direct you to

4  not record time that you spent on scene in excess of

5  three hours?

6      A.   On-scene time?

7      Q.   Yes.

8      A.   No.

9      Q.   Because I note that in your log there's some

10  entries that include up to five hours in length?

11      A.   That's correct.

12      Q.   And those would have been submitted for

13  payment?

14      A.   Correct.

15      Q.   All right.  My question to you is, did he

16  give you a specific directive saying to you

17  specifically, do not record time that you spent off

18  scene on these investigations, such as calling

19  families, such as delivering death certificates?

20      A.   I don't think he specifically said, don't

21  charge for that phone call, if that's what you're

22  asking.  I mean, that --

23      Q.   Yes, that's what I'm asking.

24      A.   Yes.  No, he did not specifically say that.

25      Q.   Were there any other activities that you

1  would do as a deputy coroner that had a scheduled time

2  such as a call-out is three hours?  Are there any

3  other activities that you would do that had a set

4  time?

5      A.   Morgue processing was a set two hours.

6      Q.   Okay.  And what do you do in a morgue

7  processing?

8      A.   You would photograph the decedent when they

9  came into the morgue, how they were, how they were

10 dressed, how they appeared.  You would unclothe the

11 individual.  You would photograph them nude.  You

12 would document any scars, marks, tattoos.  You would

13 photograph them specifically.

14      Then you would do what we would call the

15 morgue processing, so drawing of the vitreous, the

16 blood, and the urine, for the decedent.  And you would

17 log that.

18      Q.   Okay.

19      A.   For me in the morgue processing, part of that

20 would then be to package it and secure it for

21 transport to be shipped out.

22      Q.   So when -- on your personal log here, when

23 you say morgue process, that's the two hours that you

24 were referring to there?

25      A.   That's correct.  And if anything needed to be

1  documented -- generally, if they had any personal

2  effects on them, jewelry, those things, they would all

3  be documented and labeled on a form, put into the

4  evidence section for the funeral home, so all of that

5  was documented during that time.

6         (Detweiler Deposition Exhibit Number 2 produced

7  and marked for identification.)

8  BY MR. SCOTT:

9      Q.   Your attorney provided this document to me.

10  Your attorney provided this document to the defendant

11  where you allege that you were -- have 30 hours of

12  unpaid overtime per week for three years -- or, I'm

13  sorry, two and a half years for your period of

14  employment.  Is that accurate?

15     A.   Correct.

16     Q.   I assume that you assisted in creating this

17  document?

18     A.   Correct.

19     Q.   I'm trying to understand where this is all

20  coming from.  Where did you come up with the 30 hours?

21     A.   Well, quite honestly, the time varies

22  throughout the year, throughout the week, of what

23  calls come in.  So it was very -- it would be very

24  hard for us to say X amount, so it was an approximate

25  time frame of how much time we were spending each

1  week, and pretty much just put that out across the

2  board of approximately what -- how many hours we were

3  working.

4      Q.   I understand -- I understand that it was an

5  estimate and it was an approximation.

6      A.   Correct.

7      Q.   What I'm trying to get at is, where did you

8  come up with those numbers?

9      A.   Based upon the amount of time that I've

10  spent.  At the time when this was going on, the call

11  volume, the responsibility that I had, the

12  communications with law enforcement and the other

13  funeral homes.  So I was, quite frankly, very busy a

14  lot, seven days a week.

15      Q.   Did you go back and review any documents to

16  utilize for coming up with the 30 hours?

17      A.   Based upon -- yes, my -- my pay, the scale --

18  the calls that were taken during that time frame.

19      Q.   Okay.  So did you go back and review your

20  personal log as well?

21      A.   Yes.

22      Q.   You did.  In addition to the logs of all of

23  the call-outs that you had during that period of time?

24      A.   Actually what I did is I pulled all of the

25  cases that I handled in the county through the

1  electronic system, which is our reporting system, and

2  I was able to look at each call.

3      Q.    Okay.

4      A.    And I could estimate how much time.

5      Q.    And you were paid by the county an additional

6  payment of $3,792, right, for what --

7      A.    That's correct.

8      Q.    -- what they were estimating as your overtime

9  unpaid?

10     A.    Correct.

11     Q.    All right.  Let's go back around and come

12  back once again to the on-call time for this infamous

13  two-month period where you and I believe Mr. Pothering

14  were shifting off 12-hour shifts.  Is that right?

15     A.    Correct.

16     Q.    For about two months in 2016.  Is that right?

17     A.    Correct.

18     Q.    Is that every day you were shifting 12 hours?

19     A.    Yes.

20     Q.    And, again, for what -- to the best of your

21  understanding, why was this policy or procedure put

22  into place in 2016?

23     A.    It was done to, for lack of a better word,

24  free up the time for the doctors because they were

25  busy.  They both have private practices and were busy

28

1  with patients.

2      The other problem came because there were

3  complaints coming from the 911 center that the

4  calls -- when they were being paged that the doctors

5  were not calling in.  Sometimes it would go a second

6  or a third page.  So to eliminate a lot of that

7  happening, the suggestion and creation of the on-call

8  came about.

9      Q.  For those 12 hours that you were on call with

10  your pager, were you directed that you had to be in

11  the county?

12      A.  Yes.

13      Q.  But no more specific locale other than that?

14      A.  No.

15      Q.  You weren't given any directives of what you

16  could and could not do?

17      A.  No.

18      Q.  And if you had access to a cell phone, you

19  could presumably go all over the county and be able to

20  respond to a page and dispatch another deputy.  Right?

21      A.  Correct.

22      Q.  Why did this program stop?

23      A.  The....

24      Q.  This two-month period when you --

25      A.  Calendar?

1    Q.    Well, there was -- it started and then there

2  was two months and then it stopped, that you weren't

3  on doing the 12-hours shifts on and again.  Why did

4  that stop?

5    A.    We still continued to mind the pager, so to

6  speak, or on call, Joseph Pothering and I.  The

7  calendar on -- the setup calendar is what went by the

8  wayside.

9    Q.    Okay.  What changed in the setup calendar?

10  Did something change?

11    A.    Initially, Dr. Moylan said what he would do

12  as a little bonus or whatever, if you did not receive

13  a call during your 12 hours, what he would do is he

14  would give you -- he would pay you $50, even if you

15  did not get a call, for giving your time and being on

16  call.

17       And then subsequently what started to happen,

18  there were deputies that were submitting pay for half

19  the amount of time.  If they could only cover like a

20  six-hour shift, they would submit it, and if they

21  didn't get a call during that six hours, they would

22  submit it for the $50.  So Dr. Moylan felt that that

23  was just being abused, so he did away with the

24  calendar altogether.

25    Q.    All right.  So now how does it work for who

1  gets the pager and who's on call?

2      A.   There are two people that mind the pager now

3  today.  Two other deputy coroners mind the pager, so

4  someone takes the day shift and someone takes the

5  night shift.

6      Q.   Okay.  And is that bonus structure still in

7  place?

8      A.   I don't believe so, no.

9      Q.   These monthly seminars that Dr. Moylan held,

10 you were required to attend these seminars.  Is that

11 right?

12     A.   Yes.

13     Q.   What topics did these meetings cover?

14     A.   There was an array of topics.  Generally,

15 they would have someone come in about a specific topic

16 related to death investigation and then they would

17 just speak to us as group.

18     Q.   Did you find them generally helpful to your

19 career?

20     A.   Yes.

21     Q.   Was it mandatory for you to attend these

22 meetings?

23     A.   Yes.

24     Q.   How did you come to the understanding that

25 there were mandatory?

1    A.    There was an e-mail put out from the office
2  secretary that went to all deputies that said, all
3  monthly meetings -- all monthly meetings are mandatory
4  per Dr. Moylan.
5    Q.    Okay.  And, again, were there other deputy
6  coroners that did not attend?
7    A.    That's correct, that did not attend.
8    Q.    And, to the best of your knowledge, if you
9  had to miss a meeting for extenuating circumstances,
10 were there any repercussions?
11   A.    No.
12   Q.    Were there any repercussions if you continued
13 to miss meetings on a consecutive basis?
14   A.    There were conversations had about -- those
15 deputies that were actively involved in that would
16 attend the training, that they would be contacted
17 first for call-outs versus the deputies that did not.
18   Q.    So the people that would attend these
19 meetings would get benefit of --
20   A.    More or less, yes.
21   Q.    Who set up this benefit system?
22   A.    Dr. Moylan.
23   Q.    When did you first realize or come to the
24 understanding that you believed that you had unpaid
25 overtime?

1     A.   It was brought to my attention from Joseph

2 Pothering and Scott Clews.

3     Q.   My question is when?

4     A.   I guess it would have been somewhere around

5 the time frame from their depositions of -- when that

6 time frame was.  To be honest with you, I don't know

7 the time frame.

8     Q.   It could have been as early as 2015?

9     A.   No.  It was -- I believe it was later than

10 that.

11     Q.   Sometime in 2016?

12     A.   I would think sometime in '16.

13     Q.   Was there a period in 2016 where you were

14 separated from the Coroner's Office?

15     A.   I was never separated from the Coroner's

16 Office.  I was asked to step down, but there was never

17 actual separation.

18     Q.   So let's talk about the circumstances.  You

19 say you were asked to step down.  When did that occur?

20     A.   That would have been sometime in '16.

21     Q.   What were the circumstances surrounding that?

22     A.   Could have been -- might even have been '17.

23 I don't have the exact date on that.

24     Q.   '16 or '17, what were the circumstances that

25 you were asked to step down?

1    A.    At that point, it was about -- for lack of a

2    better word, there was just some discrepancies going

3    on in the office.  And at the time -- I'm trying to

4    remember exactly what the situation and the

5    circumstances were.  It was over an underlying issue

6    where there was talk about creating a full-time

7    position for me.  There was hearsay back and forth.

8    The county was saying one thing, Dr. Moylan saying

9    another.  Multiple meetings.  And I actually

10   confronted him about it.  And it turned into a little

11   bit of an argument, so he asked me to step down.

12   Q.    Okay.  That's a lot -- a lot to unpack there,

13   so I want to --

14   A.    Sure.

15   Q.    -- kind of get into....  You said -- number

16   one, you said it started, for lack of a better term,

17   regarding discrepancies.  What was the discrepancy?

18   A.    Discrepancies were over him wanting to create

19   a full-time position, the county saying they wanted a

20   full-time position, and then he would say the county

21   doesn't want a full-time position, they're not going

22   to pay for a full-time position.  And then when I'd

23   talk with the county, the county said, no, this is

24   Dr. Moylan, he doesn't want to pay for a full-time

25   position.  So there was a lot of that going on.

1    Q.    Who did you talk with at the county?

2    A.    I had spoken with Gary Bender, Commissioner

3    Halcovage, at the county level.

4    Q.    And then it got to the point where you had a

5    heated argument with Dr. Moylan at that point?

6    A.    He was heated.  I was not.

7    Q.    And he asked for your resignation at that

8    point?

9    A.    No.  He said, I want you to stand down.

10   Q.    What was your response?

11   A.    What does "stand down" mean?  He said, I want

12   you to stand down.

13   Q.    But at that -- at no point after that were

14   you separate from the --

15   A.    No.

16   Q.    So you did not tender your resignation?

17   A.    No, I did not.  In fact, I went to the Human

18   Resources and asked for clarification of what "stand

19   down" means.

20   Q.    This kind of dovetails into what I was asking

21   for or discussing with Mr. Pothering regarding the

22   letter that you and Mr. Pothering had sent.  I believe

23   this was previously marked as --

24        MR. SCOTT:  Pothering 5?

25        MR. BRENNAN:  4, I think.

1    BY MR. SCOTT:

2        Q.    4.    The document was Pothering 4, and there's

3    a letter that you and Mr. Pothering wrote to Dr.

4    Moylan.   And I'll give you a second to look at it.

5        A.    Okay, yes.

6        Q.    Is that your letter?

7        A.    Yes, it is.

8        Q.    Did you and Mr. Pothering draft that

9    together?

10       A.    That's correct.

11       Q.    What was the purpose behind the letter?

12       A.    At the time, Dr. Moylan was looking for

13   different ideas or suggestions to better improve the

14   office, the Schuylkill County Coroner's Office.  He

15   had created a proposal to create an LLC and employ

16   myself and Joe Pothering as a deputy coroner.

17             To counter that -- I speak for myself, but I

18   was not very comfortable with the LLC and what was

19   proposed.  So this was counter to Dr. Moylan as just

20   allowing us to be county employees, giving a lateral

21   move at the salaries we were at the time, and just

22   create full-time positions.

23       Q.    And what came of that job proposal?

24       A.    Nothing.  Absolutely nothing.

25       Q.    Did you have any further discussion or it was

1  just met with silence?

2      A.    There was numerous more -- numerous

3  conversations back and forth.  Dr. Moylan was in favor

4  of the LLC and really wanted the LLC.  He did not

5  really want to entertain being a county employee and

6  being paid.  He wanted us to be under an LLC, which we

7  could not come to agreement on.

8      Q.    Are you familiar with Eric Mika?

9      A.    Mika, yes.

10     Q.    Are you familiar with him?

11     A.    Yes.

12     Q.    How are you familiar with him?

13     A.    He is the Coroner's Office solicitor.

14     Q.    He testified back in October that you told

15  him you felt forced into this lawsuit.  Is that what

16  you told him?  Do you remember telling him that?

17     A.    That is not correct.  I did not tell him

18  that.

19     Q.    You said that's not correct and you did not

20  tell him.  Is that an accurate statement, that you

21  felt forced into the lawsuit or an inaccurate

22  statement?

23     A.    Inaccurate.

24     Q.    Okay.  What did you tell him, if you can

25  recall, regarding the lawsuit?

1    A.    I don't think I really ever had a
2 conversation with Attorney Mika about the lawsuit
3 itself.  There are numerous conversations with him in
4 regards to, again, creating this LLC and full-time
5 positions, but never specifically about this
6 litigation.
7    Q.    Okay.  Were you ever approached by Dr. Moylan
8 in regard to dropping this lawsuit in exchange for a
9 full-time job?
10    A.    Yes.
11    Q.    When did that happen?
12    A.    It would have been after the litigation was
13 filed.  It was a telephone call actually I had with
14 him and in regards to it.  I can even tell you, it was
15 9 o'clock in the morning, 8:30, 9 o'clock, in the
16 morning, when I had the telephone call.
17         I don't know the exact date on it.  It would
18 have been after the litigation was filed, somewhere
19 around the conversations of creating this LLC, in that
20 same time period.
21    Q.    Well, the conversations for creating the LLC
22 refer back to a January 2015 letter, and litigation
23 was at least filed by way of writ in 2016, the
24 complaint was filed in 2017, so that's a pretty big
25 gap in time.

1     A.    Well, Dr. Moylan brought up the LLC for quite
2 a long time and you can....
3     Q.    But you said it was after the lawsuit had
4 been initiated?
5     A.    When he asked me, yes.
6     Q.    Do you know whether it was after the
7 complaint was filed or before the complaint was filed?
8     A.    I'm not certain.
9     Q.    What were the details of the conversation?
10     A.    It was about creating the full-time position
11 again.  And he would continue to move forward with
12 creating the full-time position if -- as he pull it,
13 it would make it a lot easier to create the full-time
14 position, Deb, if the litigation could go away.
15     Q.    That's -- that was his quote?
16     A.    Pretty much.  That the litigation would go
17 away.
18     Q.    In Paragraph 30 of your complaint, you allege
19 Dr. Moylan advised you to submit paperwork showing
20 fewer hours than actually worked.  Is that correct?
21     A.    Say that again, please.
22     Q.    In Paragraph 30 of the complaint that was
23 filed, you allege that Dr. Moylan advised you to
24 submit paperwork showing fewer hours than you actually
25 worked?

1    A.    That would be correct.

2    Q.    When did he tell you to do that?

3    A.    He did that numerous times over the course of

4    employment there.  He would state that the county --

5    quote, unquote, the county is broke and that they

6    can't afford to pay us.

7    Q.    So when he told you that, your understanding

8    from that was that you had to reduce your hours that

9    you actually wrote down.  Is that right?

10    A.    I -- I'm not confused, but in the beginning

11    we didn't write hours down.  We would just submit the

12    calls of what we did.  I wasn't putting a time frame

13    on those hours.  So I'm not sure, are you directing it

14    to when we listed the time?

15    Q.    Well, what I'm asking for you is --

16    obviously, if he's -- if you're saying to me that he

17    advised you to write down less time than what was

18    actually done, then more than likely that goes to the

19    time when you were writing the hours.

20    A.    I'm just asking for clarification.

21    Q.    Right.

22    A.    He has also said that numerous times to us,

23    to do that.  The county has no money and they're

24    broke.

25    Q.    So when you --

40

1    A.    Take it easy on us was his other line he

2  would use.

3    Q.    So what would be your response to that?  What

4  would you do in response to him telling you that?

5    A.    Well, nothing.  He's directing me not to do

6  it, so, of course, I would listen to what he's telling

7  me to do.

8    Q.    He's directing you not to do what?

9    A.    He's directing me not to charge many hours --

10 that's what you're saying -- so he's directing me to

11 charge less.

12   Q.    Okay.

13   A.    So then we would charge less.

14   Q.    Than you actually worked?

15   A.    Less than what I -- no.  Less -- charged the

16 county less hours, yes.  I'm sorry.

17   Q.    My question to you is --

18   A.    You're confusing me now.

19   Q.    I'm not trying to do that intentionally.

20 What I'm trying to get at is, did you actually reduce

21 the hours that you worked or did you just put down

22 less hours than you actually did work?

23   A.    Less hours.  I would put down less hours than

24 I worked.

25   Q.    Than you actually worked?

1    A.    Correct.

2    Q.    All right.  That's what I was trying to get

3  to.

4    A.    Sorry.

5    Q.    Do you know how often that you would actually

6  do that, write down less hours than you did work?

7    A.    No, I don't.  I wouldn't know that unless I

8  would go back over each pay slip again, and then I

9  would have to recall it from memory.

10   Q.    You would have no other way to recalibrate

11 those hours other than your memory?

12   A.    Unless I have it documented elsewhere in a

13 private, personal log or something like that.

14   Q.    Do you have any other personal logs other

15 than the one we went to?

16   A.    I don't know.  What is the end date on that

17 log?  I may have continued that log on until January.

18 I would have to check.

19   Q.    Do you know where that might be?

20   A.    Do I know what?

21   Q.    Is that in your personal possession?

22   A.    Yes, absolutely.

23         MR. BRENNAN:  We'll produce that.  Deb, if

24 you --

25         THE WITNESS:  Yeah, I'll have to look.  I do

42

1  believe I kept that log going.  I think I kept it

2  going till January.

3         MR. BRENNAN:  All right.  Well, then we need

4  to produce that.  I gave them what I have.

5         THE WITNESS:  Okay, sure.

6  BY MR. SCOTT:

7     Q.   As part of these investigations that you were

8  doing off of the scene, following up with the

9  families, delivering death certificates, we could

10  agree that you would be in the best position to record

11  those times because nobody else is doing that for you.

12  Right?

13     A.   Correct.

14     Q.   All right.  And the payroll staff or the

15  Coroner's Office wouldn't have been able to determine

16  how much time you were spending on these because

17  you're the one that's doing them.  Agreed?

18     A.   Agreed.

19         MR. BRENNAN:  I want to note an objection to

20  the form of the question.  You can still answer this.

21  Form; the purpose being that by law the county is

22  required to keep accurate records.

23         (Detweiler Deposition Exhibit Number 3 produced

24  and marked for identification.)

25  BY MR. SCOTT:

1    Q.    I guess, lastly, this is a document that was

2  provided by your attorney's office.  This document is

3  eight pages in length and is a very detailed list of

4  your job duties.

5          Did you create this document?

6    A.    Could I just have a moment to....

7    Q.    Sure.

8    A.    Yep.  That would be correct.

9    Q.    And if I were to question you more thoroughly

10  on it, would it be true and accurate?

11    A.    Correct.

12    Q.    Your job duties?

13    A.    Yes.

14    Q.    And you don't have any times listed for any

15  of these processes.  Right?

16    A.    On here?

17    Q.    On here.

18    A.    No, I don't believe so.  I can go through and

19  look.

20          I do have -- for the autopsies, there's some

21  times indicated there that you would arrive

22  approximately two hours before the autopsy time to set

23  up for the pathologist.  And I even state the reason.

24  It was a requirement for the pathologist to allow the

25  body to be out in room temperature so it wouldn't be

1  as cold when it came time to work on them.

2      Q.   I think we had testimony earlier from Mr.

3  Clews that an autopsy can be four hours.  Is that

4  right?

5      A.   It can take anywhere from two to four hours.

6      Q.   All right.  I don't have anything further.

7          MR. BRENNAN:  My clients do want to read and

8  sign.

9          (Whereupon, the deposition was concluded at

10  1:44 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

COMMONWEALTH OF PENNSYLVANIA :
                                            :
COUNTY OF CUMBERLAND            :

        I, Susan L. Henderson, Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of Cumberland, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of

                DEBRA M. DETWEILER

        I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

        I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

        Dated at New Cumberland, Pennsylvania this 2nd day of July, 2019.

*Susan L. Henderson*
_____
Susan L. Henderson
Registered Professional Reporter
Notary Public

        The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.

**A**

ability 5:8
able 5:4 16:4
27:2 28:19
42:15
absolutely 35:24
41:22
abused 29:23
access 28:18
accumulated
14:8
accumulation
14:12
accurate 16:10
16:11,21 20:12
25:14 36:20
42:22 43:10
ACTION 1:3
actively 31:15
activities 17:10
23:25 24:3
actual 32:17
added 7:14
addition 26:22
additional 3:15
16:23 17:2
21:11 22:24
27:5
additions 7:14
address 5:16
14:20 20:23
addressed 17:11
advise 12:13
advised 38:19,23
39:17
afford 39:6
AFSCME 11:20
afternoon 4:13
4:14
ago 11:10
agree 11:25
42:10
Agreed 42:17,18
agreement 36:7
alcohol 5:7
allege 25:11
38:18,23

allow 43:24
allowing 35:20
altogether 29:24
amount 13:22
19:20,22,25
25:24 26:9
29:19
and/or 45:23
answer 4:21
42:20
answers 5:4
APPEARANC...
2:1
appeared 24:10
Appearing 2:3,5
applied 11:13
13:24
apply 45:22
appraiser 7:6,8
approached
37:7
approximate
25:24
approximately
6:18 26:2
43:22
approximation
26:5
Approximations
5:10
area 5:21 10:15
areas 7:11
argument 33:11
34:5
array 30:14
arrive 43:21
asked 9:11 20:7
20:7 32:16,19
32:25 33:11
34:7,18 38:5
asking 23:22,23
34:20 39:15,20
Assessment 8:4
8:8
assigned 3:15
7:11
assistant 2:8 6:6

assisted 25:16
associated 16:24
assume 25:16
attend 17:19
30:10,21 31:6
31:7,16,18
attention 8:20
11:11 32:1
attire 13:7
attorney 18:2,4
25:9,10 37:2
attorney's 43:2
attorneys 45:13
August 18:11
autopsies 15:1
17:19 43:20
autopsy 17:21
17:21 43:22
44:3
available 9:25
10:16,18
average 16:20
aware 13:24
14:3,6,13

**B**

back 7:1 17:3
19:7 26:15,19
27:11,12 33:7
36:3,14 37:22
41:8
background
9:12
Based 26:9,17
basic 6:19,21,22
basis 9:23 31:13
beginning 14:22
39:10
behalf 2:3,5
belabor 4:16
18:13
believe 7:12 9:2
11:21 14:18,21
14:25 16:15
19:19 20:22
27:13 30:8
32:9 34:22

42:1 43:18
believed 31:24
Bender 34:2
benefit 31:19,21
Berks 11:7,18
best 4:25 27:20
31:8 42:10
better 27:23
33:2,16 35:13
beyond 5:25
9:21 16:22
big 37:24
bit 9:11 12:25
33:11
blood 17:18
24:16
board 26:2
body 16:9,13
43:25
bonus 29:12
30:6
break 12:22
Brennan 1:17
2:2,2 18:21,25
34:25 41:23
42:3,19 44:7
briefly 7:9
broke 39:5,24
brought 32:1
38:1
busy 26:13
27:25,25

**C**

calendar 28:25
29:7,7,9,24
call 9:10 10:5,10
10:11,11,15,16
10:17 12:7
14:17 15:4
20:9,24 22:5
23:1,21 24:14
26:10 27:2
28:9 29:6,13
29:15,16,21
30:1 37:13,16
call-out 15:4

22:18,21 24:2
call-outs 26:23
31:17
called 4:9
calling 23:18
28:5
calls 9:14 15:23
17:1 22:24
25:23 26:18
28:4 39:12
capacity 7:4
8:11,12
CAPUTO 1:7
career 30:19
case 1:6 16:18
16:24
cases 17:16 18:1
22:1 26:25
cause 45:8,13
cell 22:11 28:18
center 6:2 8:6
28:3
certain 22:22
38:8
certificate 16:10
certificates
15:24 16:1
22:23 23:19
42:9
certification 4:4
6:10,13 45:22
certifications
5:25 6:15
certified 6:6 7:6
7:8
certify 45:4,7,12
certifying 45:23
cetera 19:22
change 29:10
changed 14:24
29:9
charge 17:15,21
22:23 23:21
40:9,11,13
charged 40:15
check 41:18
CHRISTOPH...

2:4
circumstances
12:10 31:9
32:18,21,24
33:5
CIVIL 1:3
clarification
34:18 39:20
Clews 1:3 2:9
32:2 44:3
clients 44:7
close 12:19 13:1
13:1
closely 12:17,18
closest 9:25
cold 44:1
come 7:1 8:20
10:12 11:11
25:20,23 26:8
27:11 30:15,24
31:23 36:7
comfortable
35:18
coming 25:20
26:16 28:3
Commissioner
34:2
Commonwealth
45:1,3
communication
17:7
communications
26:12
compensated
13:25
complaint 37:24
38:7,7,18,22
complaints 28:3
complete 6:4
45:8
completed 17:3
concluded 44:9
confronted
33:10
confused 39:10
confusing 40:18
consecutive

31:13
consequences
10:19
considered
22:25
construction
7:14
contact 12:12
17:5
contacted 12:14
31:16
continue 38:11
continued 8:7
29:5 31:12
41:17
control 45:23
conversation 9:3
37:2 38:9
conversations
31:14 36:3
37:3,19,21
cool 5:11
coroner 7:7 8:11
9:1 13:18
16:24 17:11
24:1 35:16
coroner's 11:7
13:8,14,23
14:9,19 32:14
32:15 35:14
36:13 42:15
coroners 10:22
11:12,13 30:3
31:6
correct 4:20,24
6:24 8:14,16
9:6 10:4 11:17
11:24 12:1,2,4
13:5,15,16
15:5,7,10,15
15:16 16:6,7
18:10,12,17,18
20:16 21:1,12
21:23 23:11,14
24:25 25:15,18
26:6 27:7,10
27:15,17 28:21

31:7 35:10
36:17,19 38:20
39:1 41:1
42:13 43:8,11
45:10
counsel 4:3
45:12
counter 35:17,19
county 1:7 2:7
7:3,5,12 11:4,7
11:16,19 13:12
13:21 14:7,15
18:1 26:25
27:5 28:11,19
33:8,19,20,23
33:23 34:1,3
35:14,20 36:5
39:4,5,23
40:16 42:21
45:2,4
couple 4:16
course 6:22,23
12:8 39:3 40:6
COURT 1:1
cover 29:19
30:13
covered 15:11
create 19:9 20:2
20:4,8 33:18
35:15,22 38:13
43:5
created 35:15
creating 25:16
33:6 37:4,19
37:21 38:10,12
creation 28:7
crime 13:6,14
Cumberland
45:2,4,15
current 7:2
Currently 11:3
─────────
D
date 1:16 8:16
18:17,19,20
19:16 32:23
37:17 41:16

Dated 45:15
dates 19:15
day 27:18 30:4
45:16
days 26:14
deal 13:22
dealing 19:18
death 6:19,21,22
12:7,9,15
15:24 16:1,9
16:19,25 17:1
17:8 18:20
19:17 22:22
23:19 30:16
42:9
Deb 3:13,14
38:14 41:23
Debra 1:4,14 3:2
4:8 5:15 45:6
decedent 24:8
24:16
decided 9:20
14:1
defendant 1:7
1:15 2:5 25:10
definitely 9:16
deliver 16:5
delivering 15:23
16:1,9,9 22:22
23:19 42:9
DEMANDED
1:7
dep 19:2
depend 16:18
depending 17:6
deposition 1:14
3:11 19:4 25:6
42:23 44:9
45:4
depositions 4:18
10:6 16:2 32:5
deputies 3:15
29:18 31:2,15
31:17
deputy 7:6 8:11
9:1,25 10:22
11:12,13 16:23

17:11 24:1
28:20 30:3
31:5 35:16
describe 12:6
designated
17:20
detailed 43:3
details 38:9
determine 42:15
Detweiler 1:4,14
3:2,11,13,14
4:8,13 5:15
18:2 19:1,2,3,4
25:6 42:23
45:6
different 10:9
11:20 14:18
20:18 35:13
diploma 5:19
direct 22:16 23:3
45:23
directed 20:4
28:10
directing 39:13
40:5,8,9,10
direction 45:9
directive 23:16
directives 28:15
directs 13:4
discrepancies
33:2,17,18
discrepancy
33:17
discussing 34:21
discussion 35:25
dispatch 9:24
28:20
dispatcher 8:2
DISTRICT 1:1
1:1
doctors 27:24
28:4
document 3:15
15:8,14,17
21:24 24:12
25:9,10,17
35:2 43:1,2,5

22:7
**documented**
14:14 25:1,3,5
41:12
**documents**
26:15
**doing** 7:25 20:9
29:3 42:8,11
42:17
**dovetails** 34:20
**Dr** 8:19,20,23
9:3,4,5,9 11:22
11:23,25 12:1
12:13,13,16,16
12:17,18 13:17
20:4 22:16
29:11,22 30:9
31:4,22 33:8
33:24 34:5
35:3,12,19
36:3 37:7 38:1
38:19,23
**draft** 35:8
**drawing** 17:15
17:17 24:15
**drawn** 17:16
**dressed** 24:10
**dropped** 6:18
**dropping** 37:8
**drugs** 5:6
**duly** 4:9 45:8
**duties** 12:6 43:4
43:12

**E**
**e-mail** 31:1
**e-mails** 22:11
**earlier** 44:2
**early** 32:8
**easier** 38:13
**easily** 22:10
**easy** 40:1
**education** 5:18
5:24,24
**Edward** 1:17 2:2
2:2
**effects** 25:2

**eight** 8:3 43:3
**either** 12:12
**electronic** 16:3
27:1
**eliminate** 28:6
**Emergency** 6:16
**employ** 35:15
**employed** 7:4
8:12 11:3,6
45:13
**employee** 36:5
**employees** 35:20
**employer** 7:2
14:13
**employment**
25:14 39:4
**EMS** 12:11
**enforcement**
12:11 17:5,25
22:12 26:12
**entertain** 36:5
**entire** 18:8
**entries** 18:15,17
19:16 23:10
**entry** 18:13
**Eric** 36:8
**ESQ** 2:2,4,7
**estate** 14:10
**estimate** 26:5
27:4
**estimating** 27:8
**et** 19:22
**evidence** 25:4
**exact** 8:16 32:23
37:17
**exactly** 33:4
**Examination** 3:2
4:11
**excess** 15:14,18
22:17,21 23:4
**exchange** 37:8
**exhaust** 11:3
**exhibit** 3:11
18:22 19:4
25:6 42:23
**EXHIBITS** 3:10
**expressed** 9:1

**extenuating** 31:9

**F**
**facilitating**
17:22
**fact** 34:17
**familiar** 36:8,10
36:12
**families** 23:19
42:9
**family** 17:1,4
22:24
**far** 20:9 22:19
**favor** 36:3
**felt** 29:22 36:15
36:21
**fewer** 38:20,24
**field** 7:6,8
**filed** 13:21 14:5
37:13,18,23,24
38:7,7,23
**filing** 4:4
**fill** 15:2
**filled** 21:5,17
**find** 30:18
**findings** 12:13
**first** 2:8 8:2,3
9:9 14:25
15:12 31:17,23
**five** 8:13 9:14
19:21 23:10
**flat** 14:25 15:4
15:11
**focus** 18:15
**follow** 7:13
**follow-up** 15:24
17:1
**following** 42:8
**follows** 4:10
**forced** 18:14
36:15,21
**foregoing** 45:4
45:10,12,22
**forget** 11:2
**form** 4:5 15:2
25:3 42:20,21
**forth** 9:21 19:13

33:7 36:3 45:5
**forward** 38:11
**four** 44:3,5
**frame** 25:25
26:18 32:5,6,7
39:12
**frankly** 26:13
**free** 27:24
**front** 20:18
**full** 5:4,14 45:10
**full-time** 33:6,19
33:20,21,22,24
35:22 37:4,9
38:10,12,13
**funeral** 17:5
22:13 25:4
26:13
**further** 35:25
44:6 45:7,12

**G**
**gap** 37:25
**Gary** 34:2
**generally** 25:1
30:14,18
**geographically**
10:3
**give** 5:4,13 23:16
29:14 35:4
**given** 14:22
28:15 45:8
**giving** 29:15
35:20
**GLENN** 2:7
**go** 6:9 7:13 9:4
13:6 18:14
26:15,19 27:11
28:5,19 38:14
38:16 41:8
43:18
**goes** 39:18
**going** 9:22 13:14
18:13,15,15
19:1 26:10
33:2,21,25
42:1,2
**good** 4:13,14

5:13
**graduate** 5:20
**great** 13:22
**group** 30:17
**guess** 5:10 9:10
14:5 16:3 32:4
43:1

**H**
**HAFER** 2:4
**Halcovage** 34:3
**half** 16:20 25:13
29:18
**handled** 26:25
**handwriting**
19:11
**Handwritten**
3:12
**happen** 10:18
29:17 37:11
**happened** 10:7
**happening** 5:8
28:7
**hard** 25:24
**Haven** 5:21
**head** 4:23
**heard** 4:18 12:5
**hearsay** 33:7
**heated** 34:5,6
**held** 6:17 30:9
**helpful** 30:18
**Hemlock** 5:17
**Henderson** 1:19
45:3,19
**hereinbefore**
45:5
**high** 5:19,21,25
**highest** 5:18
**hire** 10:21
**hired** 8:18 9:5,8
**hiring** 9:8
**home** 5:16 6:11
10:1 17:5 25:4
**homes** 22:13
26:13
**homicide** 17:13
**honest** 32:6

19:21
**hours** 7:17,19
14:8,10,11,12
14:25 15:6,10
15:12,15,18
16:20,22 19:22
19:22 20:22
22:17,21 23:5
23:10 24:2,5
24:23 25:11,20
26:2,16 27:18
28:9 29:13,21
38:20,24 39:8
39:11,13,19
40:9,16,21,22
40:23,23 41:6
41:11 43:22
44:3,5
**Human** 34:17

### I
**ideas** 35:13
**identification**
19:5 25:7
42:24
**identify** 13:13
**impair** 5:7
**improve** 35:13
**inaccurate** 36:21
36:23
**incidents** 10:12
**include** 23:10
**INDEX** 3:1,10
**indicated** 43:21
**individual** 24:11
**infamous** 27:12
**information**
8:24
**initially** 8:2 9:9
12:16 14:17
21:18 29:11
**initiated** 38:4
**instructions**
4:18
**intentionally**
40:19
**interact** 12:10

12:20
**interest** 9:1
**interested** 8:21
9:16 45:13
**interview** 9:10
9:11
**interviews** 15:25
**investigate** 12:9
**investigation**
6:22 15:20
16:17 17:12
21:10 30:16
**investigations**
19:17,24 22:9
23:18 42:7
**investigator**
6:20,21
**involved** 31:15
**involving** 15:19
**irrelevant** 22:4
**issue** 33:5

### J
**January** 37:22
41:17 42:2
**jewelry** 25:2
**job** 7:10,11,13
7:17,23 8:21
12:6 35:23
37:9 43:4,12
**Joe** 8:24 20:7
35:16
**Joseph** 1:4 2:10
8:22 9:2,14
29:6 32:1
**JR** 2:7
**JUDGE** 1:7
**July** 45:16
**June** 1:16 8:13
8:17,17
**JURY** 1:7

### K
**keep** 20:8 22:6
42:22
**kept** 42:1,1
**kind** 17:15 33:15

34:20
**kinds** 22:13
**know** 4:21 10:5
10:21,24 17:4
17:14,14 32:6
37:17 38:6
41:5,7,16,19
41:20
**knowledge** 31:8

### L
**L** 1:19 2:4 45:3
45:19
**labeled** 25:3
**lack** 27:23 33:1
33:16
**Lane** 5:17
**large** 13:22
**lastly** 43:1
**lateral** 35:20
**law** 1:3,17 2:2
12:10 17:5,25
22:12 26:12
42:21
**laws** 13:24
**lawsuit** 13:21
36:15,21,25
37:2,8 38:3
**Leader** 6:11
**left-hand** 18:20
19:15
**length** 23:10
43:3
**let's** 7:8 12:22,22
27:11 32:18
**letter** 34:22 35:3
35:6,11 37:22
**letting** 17:4
**level** 5:18 34:3
**liaison** 17:24
**line** 40:1
**list** 10:25 14:20
21:18 43:3
**listed** 15:1 18:16
18:17,19 19:15
19:20 39:14
43:14

**listen** 40:6
**listing** 21:21
**litigation** 37:6
37:12,18,22
38:14,16
**little** 9:11 29:12
33:10
**lived** 10:1
**LLC** 35:15,18
36:4,4,6 37:4
37:19,21 38:1
**LLP** 2:4
**local** 11:21
**locale** 28:13
**location** 14:21
20:24
**log** 3:12 18:5
19:9,14 20:3,5
20:8,17 21:25
23:9 24:17,22
26:20 41:13,17
41:17 42:1
**logs** 22:8 26:22
41:14
**long** 7:25 8:12
13:10 38:2
**look** 27:2 35:4
41:25 43:19
**looking** 11:12
35:12
**lot** 26:14 28:6
33:12,12,25
38:13
**LPN** 6:1

### M
**M** 1:4,14,17 2:2
2:2 4:8 45:6
**Mahantongo**
1:17
**maintain** 6:9
**making** 17:22
**MANAGER** 2:8
**mandatory**
30:21,25 31:3
**Marie** 5:15
**mark** 18:22

**marked** 3:11
19:5 25:7
34:23 42:24
**marks** 24:12
**math** 8:14
**matter** 15:9
45:13
**mean** 23:22
34:11
**means** 16:4
34:19 45:23
**medical** 6:16
**meet** 9:4
**meeting** 31:9
**meetings** 30:13
30:22 31:3,3
31:13,19 33:9
**memory** 41:9,11
**met** 9:9 36:1
**middle** 1:1 17:24
**Mika** 36:8,9
37:2
**mileage** 14:22
**mind** 29:5 30:2,3
**minimal** 12:24
**minimum** 9:14
**minutes** 9:25
**misunderstood**
21:16
**moment** 43:6
**money** 39:23
**month** 10:7
**monthly** 30:9
31:3,3
**months** 10:8
20:15 27:16
29:2
**morgue** 3:16
17:22 24:5,6,9
24:15,19,23
**morning** 37:15
37:16
**move** 35:21
38:11
**Moylan** 8:19,23
9:3,4,5,9 11:22
11:25 12:13,16

12:17,18 13:17
20:4 22:16
29:11,22 30:9
31:4,22 33:8
33:24 34:5
35:4,12,19
36:3 37:7 38:1
38:19,23
**Moylan's** 8:20
**Multiple** 33:9

**N**

**name** 5:14 14:20
20:23
**natural** 16:19,25
16:25 17:8,12
**need** 14:20 17:9
42:3
**needed** 17:2,16
18:1 24:25
**never** 13:9 14:11
32:15,16 37:5
**new** 7:14 45:15
**night** 30:5
**nodding** 4:23
**Notary** 1:20 45:3
45:20
**notation** 21:9,11
**notations** 19:21
**note** 15:21 23:9
42:19
**notes** 45:10
**notice** 19:2
**notification**
12:15
**notified** 12:7
**nude** 24:11
**number** 3:11
19:4 25:6
33:15 42:23
**numbers** 26:8
**numerous** 36:2,2
37:3 39:3,22
**nursing** 6:6,11

**O**

**o'clock** 37:15,15

**objection** 42:19
**objections** 4:5
**obviously** 39:16
**occur** 32:19
**October** 18:11
36:14
**office** 8:4,8 11:7
13:8,18,23
14:9,10,19
31:1 32:14,16
33:3 35:14,14
36:13 42:15
43:2
**officers** 17:25
**offices** 1:17 2:2
14:9
**Oh** 17:14 21:13
21:16
**okay** 5:2,10
10:14 11:8
13:2 15:13,21
16:12 20:2,6
20:11,14 21:7
21:20 22:7
23:3 24:6,18
26:19 27:3
29:9 30:6 31:5
33:12 35:5
36:24 37:7
40:12 42:5
**on-call** 9:23 10:6
10:8 27:12
28:7
**on-scene** 15:19
16:16,22 23:6
**once** 14:13 27:12
**original** 45:10
**Orwigsburg**
5:17
**outcome** 45:13
**overtime** 7:23
13:24 25:12
27:8 31:25

**P**

**P** 2:9
**p.m** 1:16 44:10

**package** 24:20
**packaging** 17:18
**page** 17:7 19:16
28:6,20
**paged** 28:4
**pager** 28:10 29:5
30:1,2,3
**pages** 43:3
**paid** 21:4 23:1
27:5 36:6
**paperwork** 14:5
38:19,24
**Paragraph**
38:18,22
**part** 7:10 11:15
11:18 13:8,14
22:25 24:19
42:7
**part-time** 11:13
**particular** 19:17
**parties** 4:3 45:12
**pathologist**
43:23,24
**patients** 28:1
**pay** 14:18,19
16:8 20:1 21:2
21:5 26:17
29:14,18 33:22
33:24 39:6
41:8
**payment** 23:13
27:6
**payroll** 14:16
20:19 42:14
**Pennsylvania**
1:1,18 5:17
45:1,3,15
**people** 20:21
30:2 31:18
**Perform** 3:16
**performed** 17:6
**period** 10:7 18:9
18:10 20:14,19
21:8 25:13
26:23 27:13
28:24 32:13
37:20

**permits** 7:13
**person** 12:14
17:21,24
**personal** 3:12
16:14 20:3,17
21:25 22:8
24:22 25:1
26:20 41:13,14
41:21
**personnel** 12:11
**phone** 17:1
22:12 23:21
28:18
**photograph**
14:23 24:8,11
24:13
**physically** 16:5
**place** 1:17 7:15
15:13 17:23
27:22 30:7
45:5
**Plaintiffs** 1:5 2:3
**please** 38:21
**point** 4:16 22:16
33:1 34:4,5,8
34:13
**Police** 17:24
**policy** 27:21
**position** 8:1
11:14 33:7,19
33:20,21,22,25
38:10,12,14
42:10
**positions** 35:22
37:5
**possession** 41:21
**Pothering** 1:4
2:10 8:22,24
9:2,14 18:14
20:8 27:13
29:6 32:2
34:21,22,24
35:2,3,8,16
**Pottsville** 1:18
**practices** 27:25
**PRESENT** 2:6
**presentable**

13:10,11
**presumably**
28:19
**pretty** 16:21
17:8 26:1
37:24 38:16
**previous** 16:4
**previously** 4:19
34:23
**prior** 4:17 14:5
16:2
**private** 27:25
41:13
**probably** 14:4
16:19
**problem** 28:2
**procedure** 27:21
**process** 3:16
24:23
**processes** 43:15
**processing** 24:5
24:7,15,19
**produce** 41:23
42:4
**produced** 19:4
25:6 42:23
**Professional**
1:19 45:20
**program** 6:1,4
28:22
**property** 7:15
**proposal** 35:15
35:23
**proposed** 35:19
**provide** 18:4
**provided** 18:2,3
25:9,10 43:2
**public** 1:20
13:18 45:3,20
**pull** 22:10 38:12
**pulled** 26:24
**purpose** 35:11
42:21
**purposes** 7:16
**put** 13:22 19:2
20:1 22:23
25:3 26:1

27:21 31:1 40:21,23
**putting** 39:12

**Q**

**question** 4:5 11:3 23:15 32:3 40:17 42:20 43:9
**questions** 4:17 19:14
**quite** 10:24,24 12:25 25:21 26:13 38:1
**quote** 38:15 39:5

**R**

**rarely** 13:3
**rate** 15:4,11
**read** 44:7
**real** 14:10
**realize** 14:8 31:23
**realized** 14:11
**really** 13:9 16:18 22:4 36:4,5 37:1
**reason** 5:3 20:2 43:23
**recalibrate** 41:10
**recall** 20:23 36:25 41:9
**receive** 29:12
**record** 5:14 20:12 22:17,20 23:4,17 42:10
**records** 22:12 42:22
**reduce** 39:8 40:20
**refer** 18:21 37:22
**referring** 10:8 24:24
**regard** 37:8
**regarding** 12:15

**regards** 37:4,14 36:25
**Registered** 1:19 45:20
**regular** 21:2
**related** 30:16 45:12
**remember** 8:5 33:4 36:16
**repercussions** 31:10,12
**report** 12:3
**reported** 45:8
**reporter** 1:19,19 45:3,20,23
**reporting** 17:3 27:1
**reports** 15:23 22:11
**represented** 13:18
**representing** 13:11
**reproduction** 45:22
**required** 13:7 16:23 30:10 42:22
**requirement** 43:24
**reserved** 4:6
**resignation** 34:7 34:16
**Resources** 34:18
**respective** 4:3
**respond** 12:8 28:20
**response** 34:10 40:3,4
**responsibility** 26:11
**review** 26:15,19
**right** 4:19,21,23 5:13 11:23 14:2 15:6 18:7 18:11 19:11,13

20:17 21:24 22:14 23:15 27:6,11,14,16 28:20 29:25 30:11 39:9,21 41:2 42:3,12 42:14 43:15 44:4,6
**right-hand** 19:21
**road** 21:19
**roles** 7:15
**room** 43:25
**ROTH** 2:7
**roughly** 6:19 8:10
**round** 17:14

**S**

**S** 1:4 2:10
**salaries** 35:21
**sat** 4:17
**saying** 10:5 23:16 33:8,8 33:19 39:16 40:10
**scale** 16:8 26:17
**scans** 17:20
**scars** 24:12
**scene** 12:8 13:6 13:15 15:9 21:22 22:1,9 23:4,18 42:8
**scheduled** 24:1
**school** 5:19,21 5:25
**Schuylkill** 1:7 2:7 5:21 6:1 7:3,5 11:4,16 13:21 35:14
**Scott** 1:3 2:4,9 3:3 4:12 18:24 19:1,6 25:8 32:2 34:24 35:1 42:6,25
**sealing** 4:3
**second** 19:7 28:5

35:4
**secretary** 21:6 31:2
**section** 25:4
**secure** 24:20
**see** 9:15 10:16
**seminars** 30:9 30:10
**sent** 34:22
**separate** 20:8 34:14
**separated** 32:14 32:15
**separation** 32:17
**September** 8:6
**set** 9:4,21 10:2,3 19:13 24:3,5 31:21 43:22 45:5
**setting** 17:22
**setup** 29:7,9
**seven** 8:7 26:14
**shadow** 9:13
**shadowing** 9:21
**sheet** 14:19 15:22 20:1 21:5
**sheets** 14:18 15:14 20:23 21:2,9,21
**shift** 29:20 30:4 30:5
**shifting** 27:14,18
**shifts** 27:14 29:3
**shipped** 24:21
**shipping** 17:18
**shorthand** 45:10
**showing** 38:19 38:24
**side** 18:20 19:15 19:21
**sign** 44:8
**silence** 36:1
**single** 18:13
**sitting** 4:15
**situation** 10:7,9 33:4

**six** 29:21
**six-hour** 29:20
**slip** 41:8
**solicitor** 36:13
**SOLICITOR/...** 2:8
**somewhat** 10:3
**sorry** 18:4,9 21:14 25:13 40:16 41:4
**speak** 13:3 29:6 30:17 35:17
**specific** 13:7 23:16 28:13 30:15
**specifically** 15:3 22:5 23:17,20 23:24 24:13 37:5
**specified** 13:9
**spending** 25:25 42:16
**spent** 15:8,14,17 19:23 21:10,22 21:25 22:8,17 23:4,17 26:10
**spoke** 22:12
**spoken** 34:2
**staff** 42:14
**stand** 34:9,11,12 34:18
**start** 11:8 12:22
**started** 8:6,14 29:1,17 33:16
**state** 6:24 39:4 43:23
**statement** 36:20 36:22
**STATES** 1:1
**stenographica...** 45:9
**step** 32:16,19,25 33:11
**stipulated** 4:2
**STIPULATION** 4:1
**stop** 28:22 29:4

stopped 29:2
Street 1:17
Strike 7:1
structure 30:6
subject 45:13
submit 21:3
29:20,22 38:19
38:24 39:11
submitted 14:15
20:22 21:5
23:12
submitting
20:18 29:18
subsequently
9:3 11:13 18:3
21:19 29:17
45:9
substances 5:7
suggestion 28:7
suggestions
35:13
supervision 45:9
45:23
supervisors 12:1
sure 11:2 17:22
19:8 22:10
33:14 39:13
42:5 43:7
surrounding
32:21
surroundings
12:9
Susan 1:19 45:3
45:19
sworn 4:9 45:8
system 27:1,1
31:21

T
T 2:7
take 9:20 10:17
16:17 40:1
44:5
taken 1:15 5:6
26:18 45:4
takes 30:4,4
talk 4:25 7:9

9:15 32:18
33:6,23 34:1
talked 10:6 16:2
talking 10:9,13
21:13 22:5
tattoos 24:12
tax 7:15,15 8:4,8
technician 6:16
Technology 6:2
telephone 15:23
37:13,16
tell 13:20 14:14
22:20 36:17,20
36:24 37:14
39:2
telling 36:16
40:4,6
temperature
43:25
tender 34:16
term 9:21 33:16
terms 9:7
testified 4:10
36:14
testify 45:8
testimony 44:2
45:5,8
testing 17:3
thereof 45:14
thing 14:2 33:8
things 17:4 18:1
22:11,13,22
25:2
think 10:23 18:5
18:22,24 22:4
23:20 32:12
34:25 37:1
42:1 44:2
third 28:6
THOMAS 2:4,4
thoroughly 43:9
thought 14:9
thought-out 5:4
three 14:25 15:6
15:10,12,14,18
16:20,22 22:17
22:21 23:5

24:2 25:12
till 42:2
time 4:6 6:12 9:4
9:9,24 10:21
10:23 13:23
14:1,15,18
15:8,14,17,21
16:16,23 18:9
18:10 19:20,23
19:25 20:19,23
20:25 21:3,10
21:11,22 22:17
22:20 23:4,6
23:17 24:1,4
25:5,21,25,25
26:9,10,18,23
27:4,12,24
29:15,19 32:5
32:6,7 33:3
35:12,21 37:20
37:25 38:2
39:12,14,17,19
42:16 43:22
44:1 45:4
timecard 20:25
times 18:6,16
21:18,21,25
22:8 39:3,22
42:11 43:14,21
title 3:15
today 5:8 30:3
told 13:17 36:14
36:16 39:7
topic 30:15
topics 30:13,14
total 19:22,25
21:20,22
toxicology 17:15
17:16
track 20:8 22:6
training 6:1
31:16
transcribed 45:9
transcript 18:23
45:10,22
transferred 8:3
8:8

transport 24:21
transportation
15:2
transporting
16:12,14
trial 1:7 4:6
true 5:4 43:10
45:10
truth 45:8
try 4:16
trying 25:19
26:7 33:3
40:19,20 41:2
turned 33:10
two 10:8 11:10
12:5 14:18
16:20,22 19:22
20:14 24:5,23
25:13 27:16
29:2 30:2,3
43:22 44:5
two-month
27:13 28:24
type 7:13 10:9
types 17:10
typical 16:16

U
ultimately 12:12
um-hum 4:23
um-um 4:23
unclothe 24:10
underlying 33:5
understand 5:8
11:15 25:19
26:4,4
understanding
9:24 10:2 11:1
15:11 27:21
30:24 31:24
39:7
union 11:15,18
UNITED 1:1
unpack 33:12
unpaid 25:12
27:9 31:24
unquote 39:5

urine 17:17
24:16
use 11:1 40:2
utilize 26:16

V
varies 25:21
vehicle 16:15
verbally 4:21
versus 31:17
virtual 17:19,20
vitreous 17:17
24:15
volume 26:11
vs 1:6

W
waived 4:4
want 19:14
33:13,21,24
34:9,11 36:5
42:19 44:7
wanted 9:16
22:6 33:19
36:4,6
wanting 33:18
wasn't 10:12
14:6 39:12
way 7:9 14:24
37:23 41:10
wayside 29:8
we'll 4:15,25
41:23
we're 5:10 7:11
18:19
wear 13:7,10
Weber 11:23
12:1,13,16
week 7:19,21,22
25:12,22 26:1
26:14
went 8:5 29:7
31:2 34:17
41:15
weren't 28:15
29:2
witness 3:1 4:9

41:25 42:5
45:7
**word** 27:23 33:2
**words** 13:20
**work** 8:23,25 9:2
12:17 13:4
18:5 29:25
40:22 41:6
44:1
**worked** 11:22
12:18 13:1
14:7 38:20,25
40:14,21,24,25
**working** 9:22
11:8 13:13
18:6 22:17
26:3
**worksheet** 3:14
**wouldn't** 41:7
42:15 43:25
**writ** 37:23
**write** 39:11,17
41:6
**writing** 39:19
**wrote** 35:3 39:9

___

**X**

**X** 25:24

___

**Y**

**yeah** 8:10 18:25
19:2 21:16
41:25
**year** 5:22 14:4
18:6,8 25:22
**years** 6:17,17
8:3,7,13 11:10
25:12,13
**Yep** 43:8

___

**Z**

___

**0**

___

**1**

**1** 3:12 19:1,3,4
**1:44** 44:10
**10/16** 20:20

**12** 27:18 28:9
29:13
**12-hour** 27:14
**12-hours** 29:3
**12:44** 1:16
**14** 7:12
**16** 12:25 18:8,11
18:11 32:12,20
32:24
**17** 12:25 32:22
32:24
**19** 3:12
**1989** 6:16
**1990** 5:23 6:4,8
**1993** 8:7

___

**2**

**2** 3:14 25:6
**20** 6:17 9:25
10:23
**2000** 8:9
**2010** 6:18
**2014** 8:15 12:23
12:24
**2015** 12:24,25
32:8 37:22
**2016** 18:6,9
27:16,22 32:11
32:13 37:23
**2017** 12:23 13:2
37:24
**2019** 1:16 45:16
**20th** 8:6
**21** 6:17
**24** 1:16
**25** 3:14
**2nd** 45:16

___

**3**

**3** 3:15 42:23
**3,792** 27:6
**3:17-cv-02233**
1:6
**30** 25:11,20
26:16 38:18,22
**306** 1:17
**35** 7:20

___

**4**

**4** 3:3 34:25 35:2
35:2
**40** 14:10,11
**42** 3:15
**45** 14:22

___

**5**

**5** 34:24
**50** 14:25 29:14
29:22

___

**6**

**61** 5:17

___

**7**

___

**8**

**8/16** 20:19
**8:30** 37:15
**80** 16:15

___

**9**

**9** 37:15,15
**911** 8:2,5,6 28:3

8/22/16  Tracey Wike          Dr. Weber ✓
Sch. County Morgue           1 hour
Family Viewing

8/25/16  Charlie Harig        Start 22:14
Brittany Gurin's             End 03:00
480 N. Claude A Lord Blvd
Pottsville Motor Inn         5 hrs ✓
- Overdose

8/26/16  Charlie Harig
Sch. County Morgue           2 hrs ✓
- Morgue Processed

8/26/16  Brittany Gurin
Sch. County Morgue           2 hrs ✓
- Morgue Processed

8/26/16  Christopher Lawson   2 hrs ✓
Sch. County Morgue           Andrew
- Morgue Processed
- Fatal Motorcycle Accident

8/28/16  Justen Kitsock       2 hrs ✓
Sch. County Morgue           Andrew
- Morgue Processing



DEPOSITION EXHIBIT #1
Detweiler
6-24-19

8/28/16    William Smith                2 hrs   ✓
Sch. County Morgue
- Morgue Processing                    Andrew

8/29/16    Unknown Skeletal Remains
Mahanoy Twp. Yatesville              5 hrs   ✓
Schuylkill Energy Resources
120 Yatesville Rd.                    Det
Shenandoah
9:30 AM - 2:30pm

8/30/16    Daniel Pollock        -       2 hrs.  ✓
Sch. County Morgue
Morgue Processing                     Andrew

8/31/16    Meeting c PSP $
Sr. Moylan @ Office                   2½ hrs.
Lamagna Case   Alex
4pm - 6:30pm

Payroll  Submitted  9/1/16

9/2/16   Harris Brown                    alert
         58 N. Bene St
         Sch. Haven                       11:40p - 2:30am

      - Acute MI                          3 hrs.


9/4/16   Gerard Brennan
         Rosewood Nursing Home            alert
         401 University Dr.
         Sch. Haven                       1:00p - 2:30pm

      - Pending Autopsy                   1 1/2 hrs

9/5/16   Raymond Weir                     alert
         29 Tracy Rd
         Pottsville / N. Manheim Twp.     10:30 & 11:30A

      - Cardiac                           1 hr.

9/5/16   Ronald Torill                    alert
         308 Rt 61 South
         Country Squire Hotel
         North Manheim                    11:30A - 2:30p

      - Overdose                          3 hrs

9/8/16   Charles Foster                    w/Det
        122 Center Ave.
        Sch. Haven                         9:45 - 12:30
- Medical                                  2 hrs. 45 mins

9/10/16  Charles Foster
         Morgue Processing                 3 hrs. Autopsy
         Sch. County Morgue                        Proces
         Autopsy c̄ Mary                    10:00-1:00


9/10/16  Wayne Herring
         Sch. County Morgue                3 hrs
         Autopsy c̄ Mary                    1:00 - 3:00 pm
                                           c̄ 2 HRS

9/11/16  Ronald Knoll                      19:20 - 21:30
         922 W. Race St                    2 hrs
         Pottsville                        w/Det

- Hanging

9/11/16  Alex Greig                        2 hrs
         Morgue Processed                  Joe
- Self Inflic GSW

9/14/16    Jenna Smith                    2 hrs
   Morgue Processing              Andrew

   - Self Infl GSW.

9/15/16   David Carrol                   2 hrs
   - Morgue Processing             Ed Small

   - Overdose

9/18/16   Charles Remaley              2 hrs
   - Morgue Processing             Andrew

   - Drowning

Payroll Submitted   9/19/16

9/19/16   Lance Wagner                    2 Daw.
  - Morgue Processed
    Sch. County Morgue                     2 Hrs

9/23/16   Mace Schreckengost
  Morgue Processing                        Potharing
    Pending
                                           2 Hrs
9/23/16   David Howard
  Morgue Processing                        Andrew
    GSW
                                           2 Hrs
9/24/16   Christopher Hall
    1101 W. Market St                      Det
  Pottsville

  - Overdose -Suicide                      7pm-9:30

                                           2½ hours

9/24/16   David Gillespie
    540 E. Norwegian St                    Al. Barnes

  - called to assist on scene.
    Obese male 450lbs                      2 hours

  - 2 hours on scene.  Assisted
    by fire department

            Payroll Submitted  10/3/16

10/3/16  Victor Craig                    Damiro
Morgue Process
        Pending                          2 hrs

10/4/16  Elaine Yuck
         1162 Morning Side Dr.           Det
         North Mannheim
                                         1 hr.
-  Cancer (Lung)

10/5/16  Jeremy Wilmot                   Ed Sandle
Morgue Process
        Pending                          2 hrs.

10/6/16  Jeremy Colarino                 Andrew
Morgue Process
        Hanging                          2 hrs

10/6/16  Jeremy Colarino                 Andrew
         Family Viewing
                                         1 hr.

10/7/16  Jeremy Wilmot                   Ed Smith
         Autopsy & Photos                3 hrs

10/7/16  Christopher Modysko             Andrew
Morgue Processed
        Pending                          2 hrs

10/8/16  John Frizzle
Assist Ed Smith at home                    Ed Smith
     430 East Berbco St
     Lansford        Apt 601              2. hrs.
   - Locating Next of Kin


10/9/16   Jeffrey Maurer                   Andrew
     Morgue Processed.
        G.S.W.                               2 hrs.

10/9/16   Cleaned Morgue.
     & Did Laundry

                                           3. hrs.

10/10/16
   - Frederick Culbert                     Al Barnes
       32 Clay St
    Fremont.                                 2. hrs.

   - Assist Al Barnes on scene.

10/11/16 - Frederick Culbert               Al Barnes
       Sch County Morgue
    Assist Dr. P.E. Autopsy                3½ hrs

10/12/16    Jodie Brown                                    Detweiler
           199 Geary Wolf Rd
           Pine Grove Twp.                                  4½ hrs

- Motorcycle Accident & Family notification
  in Myerstown

10/12/16    Jodie Brown                                     Detweiler
           Morgue Processed.

           Blunt force Trauma Head & Neck                   2 hrs

10/12/16    Jodie Brown                                     Detweiler
           Family Viewing
           Leb. County Morgue                               1 hr

10/13/16    Faith Shepler                                   Dave
           Morgue Processed

*   Pending                                                 2 hrs

10/14/16    Mariana Yagielniskie                            Joe
           317 W. Oak St
           Shenandoah, Pa                                   2 hrs

10/16/16    Jack Hatter                                     Al Barnes
           Assist on Scene 31 Vaux St Fremont               2 hrs
                      Submit Payroll 10/17/16

10/17/16    Joel Hatter                    Al Barnes
Morgue Process & Clean Up
from fall                                  2 hrs

10/18/16    Joel Hatter                    Al Barnes
            Sch. County Morgue
                                           75.00  3 hrs
Assist Dr. P in Autopsy

10/19/16    Joseph Breshore               Detweiler
    40 Wild Cherry Rd.
Washington Twp.        50.00   2 hrs.
Sch. Haven

    Pending Toxicology

10/19/16    Joseph Breshore               Detweiler
    Morgue Process
                                           2 hrs
Pending Toxicology

10/29/16    Gary Karpinich               Andrew
    Morgue Process
                                           2 hrs
Pending Toxicology

10/29/16    Tracey Knoll        Palette
        Morgue Process          Inv.

Pending Lox

- Payroll Submitted

## DEB DETWEILER:

**2014**       30 hrs./wk. x 52 wks. = 1,560 hrs.

        21.5541      5/05/2014 – 6/01/2014
        x   1.5
         32.33 x 780 hrs.                $ 25,217.40

        24.2593      6/02/2014 – 12/2014
        x   1.5
         36.39 x 780 hrs.                  28,384.20
                                     $ 53,601.60

        Money paid from Coroner      $  3,215.50

        Total Unpaid Overtime       $ 50,386.10

**2015**       30 hrs./wk. x 52 wks. = 1,560 hrs.

        24.9871
        x   1.5
         37.49 x 1,560 hrs.            $ 58,484.40

        Money paid from Coroner      $  9,622.00

        Total Unpaid Overtime       $ 48,862.40

**2016**       30 hrs./wk. x 32 wks. = 960 hrs.

        25.7367
        x   1.5
         38.61 x 960 hrs.             $ 37,065.60

        Money paid from Coroner      $  8,745.00

        Total Unpaid Overtime       $ 28,320.60

        TOTAL 3 YEARS          $127,569.10



DEPOSITION
EXHIBIT #
Detweiler
6.24.19

### Additional Deputies that were Assigned to Me Only to Perform:

### Morgue Process

Any decedent that was transported to the Schuylkill County Morgue was to be morgue processed by myself per Dr. Moylan's request. The deputy that was assigned that case would contact me either by telephone or text message and advise the decedent name and Date of birth.

I would than go to the morgue and remove the decedent from the cooler area and photograph the decedent clothed, remove the decedent's clothing and photograph the decedent again. Document any scar, marks, tattoos, trauma to the body. Specimens would then be drawn: Vitreous, Urine and blood and label for shipment. Urine drug screen would be completed. Decedent would then be fingerprinted and a DNA protein card completed.

Personal belongings sheet would be completed and all personal belongings were photographed and placed in a bag labeled with the decedent dame, date of birth and the date of death. The personal items would be then placed in the top filing cabinet inside the morgue for the funeral home to be given when the decedent was then picked up.

Decedent would then be placed back in the cooler for holding.

I would than contact Dr. Moylan and advise of all the findings.

I would than go into the reporting program and document the morgue process and any findings along with the chain of custody information.

Specimens would then be package for shipment and complete the paperwork for shipment.

I would upload the completed chain of custody form into the reporting program

Take the specimens to the court house for pick up by Fed Ex.

When the Toxicology Results are received from NMS Labs I would also upload the tox report into our reporting system and then input the findings into the reporting system case file.

If an autopsy was completed I would than email the pathologist the toxicology report.

### Overdose Calls:

Any overdose calls that were received no matter where they were in the county were assigned to myself to handle. Again, like all the other calls the same steps would be taken, in addition with the drug cases there was more photographing and specimens drawn on scene due to the police request for it.

Collecting and Bagging Evidence.

Testing illicit drugs with the NIK testing kits to confirm which drug we were dealing with.

Interviewing friends of the decedent and family of the decedent.

EXHIBIT "B"


PENGAD 800-631-6989

DEPOSITION
EXHIBIT
Detweiler
6.24.15   SHH

Identifying needle marks on the decedent.

Collecting of any needles for disposal

## Overdose & Suicide Data:

I would keep track of the reporting system after the primary deputy completed his report to make sure all deaths were being categories properly. Correcting errors that were enter by any of the other deputies.

I would run the reports for the overdose data as well as the suicide data, providing that information to the Drug and Alcohol office, Suicide Prevention, The Pottsville Republican and Reading Eagle Newspapers.

Attend the Suicide Prevention monthly meeting and give an updated monthly report. Talk with the newspaper pertaining to articles with the coroner's office.

## Closing Cases:

At Dr. Moylan request I was asked to assist with closing cases. Which included gathering all information that was needed on any death was that still listed as pending so a cause of death could be issued. Once all information was completed for a case I would contact Dr. Weber or Dr. Moylan via telephone and review the cases with them and a cause of death would then be given.

There were other times I would get together numerous cases and leave them on the table in the coroner office for both Doctors to review. I would leave a large colored sticky Memo on the front for them to list the cause of death. Either Doctor would call once completed and I would pick up the files and contact each deputy with the cause of death as well as enter it into the reporting system.

I would than contact the primary deputy and give them the cause of death for the death certificate to be issued.

I would than enter into the reporting system in the cause the cause of death and from which Doctor

## Police Liaison

I was appointed by Dr. Moylan as the law enforcement Liaison. With any coroner's case for our county, even if I was not the primary deputy, that involved law enforcement I was to reach out to them and keep in constant contact with the case and where it was heading. Also, I was law enforcement's primary contact when any of them needed copies of coroner's report, death certificates, toxicology and autopsy reports. They would either text, email or call and request what was needed and I would email them whatever they needed.

## Supervise

Per Dr. Moylan I was to supervise the other deputies and correct them when they were doing something wrong. I would email all the deputies with reminders when there was a change to procedure or when a deputy would forget or fail to do something.

I would advise Dr. Moylan of the issue and what corrections were made, email sent, talked to the deputy direct. Ect

Joe Pothering and myself were in charge of training any new deputy that was hired by the coroner's office as well.

## Overseeing of the Morgue

Per Dr. Moylan I was to oversee the morgue which included keep it clean. I would clean the morgue (wipe down the equipment, sweep and mop the floors) whenever it was need. Kept an inventory of the morgue supplies and worked hand in hand with the secretary regarding ordering supplies when needed. Keeping the morgue fully stocked with supplies for the pathologist and the other deputies. Over the course of the last four years there were many time I had to purchase cleaning supplies out of my own money and was never reimbursed in order to clean the morgue, including Bio-Hazard bags and regular garbage bags.

## Setting up Autopsy's

If an autopsy was requested for any decedent within the county and it was not a forensic autopsy they were completed at the Schuylkill County Morgue. Dr. Moylan would contact me and it was my job to contact the pathologist and arrange for a date and time for the autopsy. I would brief Dr. Pascucci of the case and gather all information which may be need for Dr. Pascucci. Example would be medical records, copy of the coroner's report. I would than contact Dr. Moylan and advise when the autopsy would take place. I would than contact other deputies to see who was available to take photographs for the day of the autopsy.

Setting up for the autopsy you would arrive 2 hours prior to the autopsy time and remove the decedent from the cooler. This was done to allow the decedent to warm up a little so they were not as cold for the pathologist. Set up the required equipment Dr. Pascucci uses, label containers with the decedents name, date and autopsy number. Fill out the front autopsy sheet with the decedent's information.

Assist Dr. Pascucci with the autopsy. Assist with opening the chest, weigh organs, draw blood, any other deputies the pathologist requested, and then sew the decedent closed, wash and dryer and place in body bag. Most times you would than wait for the funeral home to arrive for release.

Keeping track of the autopsy log book and making sure that if someone else assisted

## Unclaimed

If the decedent had no next of kin the primary deputy would contact me and I would place an ad in the newspaper for the next of kin. Also, I would do searches over the internet for any next of kin. If no next of kin could be located and if the decedent has been on our care for more than 10 days. I would complete the death certificate as the funeral home, complete the burial transit paperwork, social security paperwork and a lateness letter for the registrar. I would than contact the funeral home that is

contracted to handle our cremations of the unclaimed and arrange for removal. Drop off death certificate, burial transit paperwork and the lateness letter with registrar and mail the social security paperwork.

If in the event I was able to locate next of kin I would contact them by telephone and advise of their loved ones passing and encourage them to pick a funeral home.

### Training new deputies

Any new deputies that would be hired into the coroner's office would then be trained by Joe Pothering and myself

### Newspaper releases

Any time I was contacted by the newspaper for information I was to give them whatever they needed.

Below are other job functions I performed as well :

Closing cases with families with Dr. Moylan

Family Viewing at morgue

Preparing bodies for family viewings (Washing, cleaning up and presenting decedent)

Releasing bodies (If no one was available to release the decedent, would go to morgue to meet funeral home for release)

Make copies of photos on disk for law enforcement and then drop off at the police department

Disposal of medications that were not overdose related by bring the medications from the coroner's office to the courthouse to the Sherriff's office for disposal

Homicides

All the same applies from the previous write ups with the addition as follows:

- Home would be cleared until a search warrant was obtained
- Forensic Service Unit would be contacted to come to the scene. Once the warrant was obtained and the Forensic Service unit arrives entry would then be gained into the home and the home would be process by the forensic service Unit.
- You would assist the State Trooper with whatever he needs or request through the investigation.
- You photograph and document all findings including measurements, evidence ect
- Most likely you will draw specimens on scene and complete a urine drug screen.
- Package decedent, sealing the bag with an integrity seal.
- Contact Next of Kin
- Attend autopsy once scheduled and photograph at the autopsy. Autopsy can be scheduled at Reading Hospital, Lehigh Valley Hospital or the Schuylkill County Morgue.
- If the autopsy is scheduled at the Schuylkill County Morgue I would then be the autopsy assistant for the pathologist.

**If toxicology was completed when the report comes back I call the family and give the results
** If a virtual Scan was completed I also call the family back after the scan and give the results
**Once a cause of death if given I also call family and give results before issuing the death certificate
**If an autopsy is completed I call the family after it is complete and give the results
**When the decedent is picked up from the morgue I also call the family and let them know care was transferred to funeral home.

Basically every step of the way I call and let the family know what is going on and where the person is

## Natural Death

- Respond to the call from whatever location I am in the county.
- Once on scene meet with EMS and Law enforcement personnel to get information regarding the case and get dispatch and arrival times from EMS, writing all information down that is provided.
- Locate the decedent, give pronounced time of death and then photograph the decedent and the surrounding room.
- Further examination of the decedent is than completed with a head to toe physical check of the decedent, which includes rolling the decedent if need be. Making any notes regarding any injuries to the decedent, scars, marks, tattoos.
- Speak to the family of the decedent, figure out who is the next of kin and gather all information regarding the decedent; name, date of birth, social security number, veteran status, working status, marital status, any children, past medical history, social history, behaviors of the decedent, primary care physician, gathering additional information through questioning on how the decedent was days and weeks prior to the event. If the next of kin is not present advise the family member who the next of kin is by law.
- Photograph the rest of the home/apartment
- Locate the medications, photograph all bottles and write down a list of all medications and then take medications into custody for disposal. Remove medication from the home and secure in personal vehicle.
- Locate decedents wallet/purse for driver license for photo identification.
- Return to the decedent and photograph driver's license next to the decedent face for comparison.
- Remove any jewelry from the decedent and present it to next of kin if present. If no next of kin in present in the home, a search would then be done for any valuables to take into custody so they are secured and not left in the home. Example Check book and cash.
- Make decedent presentable for family. Pillow under head, cover with a blanket, clear any bodily fluids, remove intubation tube.
- Contact Dr. Moylan/Dr. Weber regarding the case, give all information to see if transportation to Schuylkill County Morgue will be needed
- If transport is needed contact the transportation coordinator and advise address location for transport. If no transport is needed contact funeral home of the families choosing.
- Packaged decedent for transport and fill out toe tag and tag for on the outside of the body bag with decedent's information

- Wait on scene for funeral home to arrive and help with the removal of the decedent.
- Clear the scene
- Once home, report would be completed in the currently filing system. On average 1 ½ - 2 hours to complete.
- There are times medical records will need to be obtained so I will than fill out the information for a subpoena and fax to the medical agency.
- There are times when you need to contact the primary care physician for additional information regarding the decedent. If you contact the primary care physician you than need to contact Dr. Moylan and advise him of what the primary care had to say.

- Death Certificate would then be completed with either a pending status or a cause of death. Up until Jan 2016 all death certificates would then have to be driven to the funeral home and dropped off. Since Jan 2016 this has occurred less frequently due to the funeral home accepting death certificates by email, however it still does occur with some funeral homes within the county.
- Email coroner's report to Law enforcement agency
- Pick up medical records from Doctors office or local hospital when complete and scan a copy into my computer than deliver the copy to Dr. Moylan or the Coroner's Office

\*\*If toxicology was completed when the report comes back I call the family and give the results
\*\* If a virtual Scan was completed I also call the family back after the scan and give the results
\*\*Once a cause of death if given I also call family and give results before issuing the death certificate
\*\*If an autopsy is completed I call the family after it is complete and give the results
\*\*When the decedent is picked up from the morgue I also call the family and let them know care was transferred to funeral home.

## Suicides – Hanging

All the same steps apply from the natural death write up as well to the suicides with the additional duties as follow:

- If this is a hanging, you may need to cut down the decedent from where ever they are handing.
- If this is a suicide involving a gun. Pronounce the decedent and clear the room until all law enforcement personnel are on scene and then reenter the building with law enforcement to determine if this is a suicide or homicide.
- Locate and look through the decedent cell phone and photograph
- Search and locate a suicide note if one exists and photograph
- Search and locate any contraband
- Check social media for any posts and screen shot post for evidence
- Once you follow up with Dr. Moylan or Dr. Weber, toxicology may be drawn on scene which consists of Vitreous fluid, Urine and Blood.
- Urine drug screen test preformed with On Site Testing Specialist and photographed.
- Secure specimens for shipment
- Interview any friends, coworkers ect.
- Notify next of kin
- If requested by Dr. Weber or Dr. Moylan for specimens to be sent for further testing the specimens would then be labeled with the decedents name, date of birth and sample letter. A requisition and chain of custody form would then be completed for NMS Labs. The form would be typed with the follow information decedent name, Date of birth, date, time, and location of where specimens were drawn, how the samples are labeled and a request for which test to be completed. The paper work is then printed and package in the lab approved containers and sealed with an integrity sticker. Fed Ex Shipping label is than attached to the outside of the shipping bag and the specimen box is than placed inside and sealed for shipment.
- Specimens would then be taken to the court house the next morning to the security area of the court house for pick up from Fed Ex
- If decedent is transported to the morgue you would than go to the morgue and morgue process the decedent which includes photographing the decedent with clothing, removing the clothing and photographing the decedent again, drawing fluids if not done on scene, drug testing, documenting any scars, marks, tattoo's or trauma.

**If toxicology was completed when the report comes back I call the family and give the results
** If a virtual Scan was completed I also call the family back after the scan and give the results
**Once a cause of death if given I also call family and give results before issuing the death certificate
**If an autopsy is completed I call the family after it is complete and give the results
**When the decedent is picked up from the morgue I also call the family and let them know care was transferred to funeral home.