## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**SCOTT CLEWS,**
**JOSEPH S POTHERING, and**
**DEBRA M DETWEILER,**

        **Plaintiffs**

    *versus*

**COUNTY OF SCHUYLKILL,**

        **Defendant**

**Case # 3:17-cv-02233**

**(Judge Wilson)**

**Jury Trial Demanded**

**Electronically Filed**

## DEFENDANT'S BRIEF IN SUPPORT OF
## SECOND MOTION FOR SUMMARY JUDGMENT

Defendant, County of Schuylkill ("County"), through its attorneys, Thomas, Thomas, & Hafer, LLP, respectfully submits the following Brief in Support of its Second Motion for Summary Judgment:

**I.      PROCEDURAL BACKGROUND**

Plaintiffs Scott Clews ("Clews"), Joseph S Pothering ("Pothering"), and Debra M Detweiler ("Detweiler") are/were employees of defendant, County. The plaintiffs allege they were employed in regular positions within the County and also as deputy coroners. In general, the plaintiffs collectively claim the County did not properly pay overtime wages for hours worked as deputy coroners.

On or about November 6, 2017, the plaintiffs initiated this lawsuit in the Court of Common Pleas of Schuylkill County asserting two claims under the Fair Labor Standards Act ("FLSA") and Pennsylvania Minimum Wage Act ("PMWA"). (Doc 2). The County removed the action to this Court on December 5, 2017. (Doc 1). On December 12, 2017, the County filed a partial motion to dismiss under Rule 12(b)(6). (Doc 4).  In response to the motion to dismiss, Plaintiffs filed an Amended Complaint on January 5, 2018. (Doc 7).  An Answer with affirmative defenses was filed by the County on January 19, 2018. (Doc 8).

Plaintiffs' Amended Complaint asserts failure to pay overtime wages pursuant to the FLSA (Count I) and retaliatory discharge as violation of the FLSA, specifically alleging that all three plaintiffs were discharged from employment on June 1, 2016 as a result of inquiring about unpaid overtime (Count II).

Defendants moved for summary judgment after completion of discovery. (Doc 20) This Honorable Judge granted summary judgment, due to the "personal staff exemption" of the Fair Labor Standards Act.[1] (Doc 36).

The Plaintiffs appealed to the Third Circuit Court of Appeals and the panel reversed the grant of summary judgment, modifying the "personal staff exemption" test for the Third Circuit and remanding for additional fact finding, using the new, modified test.  (Opinion Attached as Exhibit 1).

---

[1] Premised upon the standards set forth by the Fifth Circuit, in the absence of any controlling precedent from the Third Circuit; also known as the "Teneyuca Factors."  767 F.2d 148, 151 (5th Cir. 1985).

Thereafter additional discovery ensued by both parties.  Upon the conclusion of additional discovery, there remain no material issues of fact in dispute and this matter is ripe for summary judgment.  For the reasons that follow, Defendant respectfully requests the Court grant their motion (Doc 73) and dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 56(a).

## II.    ISSUES PRESENTED

A.    **Should summary judgment be granted to the County on Count I of plaintiffs' complaint because plaintiffs are not "employees" as defined under the Fair Labor Standards Act (FLSA)?**

Suggested answer: *Yes*.

B.    **Should summary judgment be granted to the County on Count I of plaintiffs' complaint even if plaintiffs are "employees" under the FSLA because plaintiffs have failed to produce any evidence that they are entitled to payment of overtime without resorting to conjecture?**

Suggested answer: *Yes*.

C.    **Should summary judgment be granted to the County on Count II of plaintiffs' complaint because plaintiffs have failed to produce any evidence that (1) plaintiffs engaged in protected activity under the FLSA, (2) that the County took adverse employment action against them, and (3) a causal link between any protected activity and employer's adverse action, if any?**

Suggested answer: *Yes*.

## III.   FACTUAL BACKGROUND

Defendant refers the Court to the Statement of Facts filed with its Second Motion for Summary Judgment. (Doc 74).

## IV.   ANALYSIS

### Legal Standard – Summary Judgment

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." An issue is "genuine" if there is sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. Kaucher v. Cnty of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). A factual dispute is material if it might affect the outcome of the case under governing law. Id. (citing Anderson, 477 U.S. at 248). Under Rule 56 the court must view evidence in the light most favorable to the nonmoving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa, 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrates the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

## Argument

### A.   Summary judgment should be granted to the County on Count I of plaintiffs' complaint because plaintiffs are not "employees" as defined under the Fair Labor Standards Act (FLSA).

The "personal staff" of elected officials are not provided with protections under the FLSA as they are not "employees" as defined within the statute.  Factual discovery has shown that they were "personal staff" of the elected coroner of the County, David Moylan, M.D.  Summary judgment should be granted to the County as the plaintiffs cannot prevail.

The FSLA and its jurisdictional parameters are generally as outlined in 29 USC § 203(e) and in the Code of Federal Regulations, 29 CFR § 1620.1(a) (1987).

"Employees" that are protected by the FLSA are defined under 29 USC §

203(e)(2)(C) with a specific exception for "personal staff" of elected officials in

subsection (ii)(II):

> (2) In the case of an individual employed by a public agency, such term means…
> (C) any individual employed by a State, political subdivision of a State, or an interstate governmental agency, other than such an individual—
> (i) who is not subject to the civil service laws of the State, political subdivision, or agency which employs him; and
> (ii) who—
> (I) holds a public elective office of that State, political subdivision, or agency,
> (II) is selected by the holder of such an office to be a member of his personal staff,
> (III) is appointed by such an officeholder to serve on a policymaking level,
> (IV) is an immediate adviser to such an officeholder with respect to the constitutional or legal powers of his office, or
> (V) is an employee in the legislative branch or legislative body of that State, political subdivision, or agency and is not employed by the legislative library of such State, political subdivision, or agency.

29 USC § 203(e)(2)(c).  The regulations, under the FLSA, provide specific

exclusions for "personal staff" of elected officials:

> (a) Section 3(e)(2)(C) provides an exclusion from the Act's coverage for officials elected by the voters of their jurisdictions. Also excluded under this provision are personal staff members and officials in policymaking positions who are selected or appointed by the elected public officials and certain advisers to such officials.
>
> (b) The statutory term "member of personal staff" generally includes only persons who are under the direct supervision of the selecting elected official and have regular contact with such official. The term typically does not include individuals who are directly supervised by someone other than the elected official even though they may have been selected by the official. For

example, the term might include the elected official's personal secretary, but would not include the secretary to an assistant.

(c) In order to qualify as personal staff members or officials in policymaking positions, the individuals in question must not be subject to the civil service laws of their employing agencies. The term "civil service laws" refers to a personnel system established by law which is designed to protect employees from arbitrary action, personal favoritism, and political coercion, and which uses a competitive or merit examination process for selection and placement. Continued tenure of employment of employees under civil service, except for cause, is provided. In addition, such personal staff members must be appointed by, and serve solely at the pleasure or discretion of, the elected official.

29 CFR § 553.11.

Under section 203(e)(2)(c), plaintiffs would be FLSA covered employees only if they were covered by a Pennsylvania state civil service law or if they worked for a public agency but were not a member of the "personal staff" of an elected official.

### 1).    Exemption from Civil Service

Plaintiffs here are not subject to the Civil Service Act, 71 P.S. § 741.3. The FLSA provides protections to those who are "subject to the civil service laws". 29 USC 203(e)(2)(c)(i).

This Honorable Judge found as fact that the Plaintiffs were not subject to "civil service laws" in the prior memorandum, which was not the topic of the appeal to the Third Circuit Court of appeals.  (Doc 35 p 14; *see* Exhibit 1 generally).

The Plaintiffs were, therefore, not "employees" under 29 USC §

203(e)(2)(C)(i).

**2)    Personal Staff**

After the initial inquiry confirming that plaintiffs were not "civil servants",

we must look at whether they to meet the definition of exempt "personal staff"

under the FLSA.  29 USC § 203(e)(2)(c)(ii)(II).

Outside of the instant matter, drawing precedential opinion from the Third

Circuit Court of Appeals (*see* Exhibit 1), few cases exist within the Third Circuit

defining who is an "employee" under the FLSA.

Unlike with the clear-cut determination of civil service employee status,

courts have held that we must look to the "nature and circumstances of the

employment relationship between the complaining individual and the elected

officials to determine if the [personal staff, policymaking or legislative exceptions

apply]." Teneyuca v. Bexar County, 767 F.2d 148, 152 (5th Cir. 1985). *See*

*generally* 72 A.L.R. Fed. 522, §§ 7-8 (1985), "Who is 'Employee,' [sic] As Defined

in § 701(f) of the Civil Rights Act of 964, 42 USCA § 2000e(f)."

Although the FLSA itself does not define what is meant by "personal staff,"

it is well established that courts considering personal staff exemptions to that

statute may be guided by cases interpreting an analogous exemption to Title VII.

Rodriguez v. Township of Holiday Lakes, 866 F. Supp. 1012, 1021 (S.D. Tex. 1994) (*citing* Nichols v. Hurley, 921 F.2d 1101, 1103 (10th Cir. 1990)).

Again, prior to the Third Circuit weighing in, the leading case on the "personal staff" exemption was Teneyuca v Bexar County, where the Fifth Circuit outlined a list of six factors to consider in deciding whether the exemption applies. These factors include:

> (1) whether the elected official has plenary powers of appointment and removal;
> (2) whether the person in the position at issue is personally accountable to only that elected official;
> (3) whether the person in the position at issue represents the elected official in the eyes of the public;
> (4) whether the elected official exercises a considerable amount of control over the position;
> (5) the level of the position within the organization's chain of command; and,
> (6) the actual intimacy of the working relationship between the elected official and the person filling the position.

Teneyuca at 151.

Courts have interpreted the FLSA's "personal staff" and "policymaking" exemptions consistently with their Title VII counterparts. *See* Nichols, 921 F.2d 1101, 1110 (10th Cir. 1990), Birch v. Cuyahoga County Probate Court, 392 F.3d 151, 161 (6th Cir. 2004).

Prior to the instant remand Opinion here, the lone decision from the Third Circuit regarding the "personal staff" exception was Marburger, 225 F. Supp. 2d 503 (E.D. Pa. 2002), which created its own, hybrid, seven-factor test, identical to

the six factor test from <u>Teneyuca</u> which does not need to be analyzed here due to the <u>Clews</u> decision.[2]

As to the instant remand, in the Opinion of the Third Circuit, the six factor <u>Teneyuca</u> test should not be changed, *per se*, but be boiled down to "two themes", which, in some ways, "overlap" and also "encompass" several of the <u>Teneyuca</u> factors.  (Exhibit 1 at 18).

In the "first *theme*", an employee "must work closely with the official in a sensitive position of trust and confidence."  (Exhibit 1 at 14).   The "first *theme*" encompasses the following four (4) <u>Teneyuca</u> factors:

      • <u>Teneyuca</u> factor 2: whether the plaintiff is accountable to only the elected official;

      • <u>Teneyuca</u> factor 3: whether the plaintiff represents the elected official in the eyes of the public;

      • <u>Teneyuca</u> factor 5: the plaintiff's position within the organizational chain of command;

      • <u>Teneyuca</u> factor 6: The actual intimacy of the working relationship between the elected official and the plaintiff.

(Id.).

---

[2] The Marburger Court included a seventh question based upon the "policymaking decisions" of the Plaintiff that were unique to the analysis that case and unnecessary to our analysis.

In the "second *theme*", the court distilled several of the factors to "the official's personal control over the employee's hiring, promotion, work conditions, discipline and termination." (Exhibit 1 at 15). The "second *theme*" assesses the remaining two (2) Teneyuca factors:

> • Teneyuca factor 1: whether the elected official has plenary powers of appointment and removal;

> • Teneyuca factor 4: whether the elected official exercises a considerable amount of control over the position.

(Id.).

Using the two "theme" test from the Third Circuit, as applied to the Plaintiffs here, it remains clear that they are not "employees" as defined by the FLSA and are exempt as "personal staff" of an elected official. All three plaintiffs allege violations of the FLSA while they were employed as "deputy coroners", (Doc 7, ¶16); therefore, we will utilize that position for the "*Clews Theme Test*", as applied to the Clews Plaintiffs.

**First Clews Theme:**

**a) Personally accountable to elected official:**

All three plaintiffs confirmed that every assignment for dispatch to a crime scene came directly from the Coroner via telephone. (Doc 74, ¶¶32, 39, 42). Further, after every assignment was completed, they would report their

findings on cause and manner of death via telephone directly to the Coroner. (Doc 74, ¶32). They all admitted that Dr. Moylan was their supervisor and all three reported directly to the Coroner regarding his/her duties. Plaintiff Pothering testified that he worked closely with Dr. Moylan on a daily basis. (Doc 74, ¶37). Plaintiff Detweiler testified that she worked very closely with Dr. Moylan in the past and Moylan continues directs her work as her supervisor. (Doc 74, ¶43).

Clews and Pothering testified that their job duties as a deputy coroner were to go out to a crime scene and determine a manner and cause of death as well as take photographs, attend autopsies and transport bodies to and from funeral homes, all on behalf of the Office of the Coroner. (Doc 74, ¶¶10, 38).

They (plaintiffs) all worked very closely with Moylan. Detweiler and Pothering were very active in the day-to-day workings of the coroner's office. Really into the work. Working closely with each other would include in-depth discussions, autopsy. Detweiler was very active with the autopsies and assisting the pathologist. (Doc 74, ¶50).

**b) Do they represent the elected official in the eyes of the public:**

All three Plaintiffs testified that Dr. Moylan informed them that they were representing the Coroner's office in public. (Doc 74, ¶¶36, 42, 45). They

were directed by the Coroner to wear professional attire to a crime scene and they were required to wear their county badge, identifying themselves employees of the Coroner's office, at every crime scene.  (Doc 74, ¶¶33-35, 40-41).

Specifically, Detweiler testified that when the Deputy Coroners were to go in public to a crime scene, they were told by Moylan that they must be presentable "because you were representing the county."  (Doc 74, ¶44). Pothering offered that he was Moylan's "eyes" at a crime scene and was his "first line" observer.  (Doc 74, ¶39).

**c)  Level within the chain of command:**

Without further redundancy, Plaintiffs testified that they are all deputy coroners and all reported directly to Moylan and that he directs and supervises their work with no intermediary.  (Doc 74, ¶¶31, 37, 43). Pothering testified that he was Moylan's "eyes" and his "first line" at a crime scene.  (Doc 74, ¶39).

The elected coroner (Moylan) held disciplinary authority.  If there was inappropriate behavior at a death investigation that would be brought to his attention and he would discuss it with the deputy and make any appropriate notes in the file.  (Doc 74, ¶51).

The Commissioners would not hire or fire, it would come through the Coroner and approved by the Commissioners.  (Doc 74, ¶52).

The coroner's office is a separate office from the commissioners, often called a row office. Its mission is to determine in the cases of unexpected or suspicious deaths, the cause of death and manner of death.  (Doc 74, ¶46).

Plaintiffs did not have the right to hire or fire anyone, buy equipment, enter into contracts or make policy. Policy making was up to Moylan and Dr. Weber. (Doc 74, ¶48).

**d)  The actual intimacy of the working relationship:**

All three plaintiffs testified that they worked "closely" with Dr. Moylan. Plaintiffs Pothering and Detweiler described the working relationship as "very close". (Doc 74, ¶¶37, 43).  While Plaintiff Clews testified he would speak to Dr. Moylan for every single job assignment and again after completion of task to report the crime scene findings and cause/manner of death.  (Doc 74, ¶32).

They (plaintiffs) all worked very closely with Moylan.  Detweiler and Pothering were very active in the day-to-day workings of the coroner's office. Really into the work.  Working closely with each other would include

in-depth discussions, autopsy. Detweiler was very active with the autopsies and assisting the pathologist. (Doc 74, ¶50).

Moylan frequently works closely with deputy coroners and does field investigations. The deputies work primarily in the field.  (Doc 74, ¶46).

## Second Clews Theme:

### a)  Plenary Powers of appointment and removal:

The current coroner, Dr. Moylan, was elected in 2012.  It is undisputed that Dr. Moylan has the power to hire and fire deputy coroners.  (Doc 74, ¶13). Additionally, Commissioner Hess confirmed that the elected Commissioners do not hire or fire, it would come through the Coroner and approved by the Commissioners.  (Doc 74, ¶52).

### b)  Elected official control over the position:

Every assignment for dispatch to a crime scene came directly from the Coroner via telephone. Further, after every assignment was completed, they would report their findings on cause and manner of death via telephone directly to the Coroner.  (Doc 74, ¶32). They all admitted that Dr. Moylan was their supervisor and all three reported directly to the Coroner regarding his/her duties. (Doc 74, ¶¶31, 37, 43). Plaintiff Pothering testified that he worked closely with Dr. Moylan on a daily basis.  (Doc 74, ¶37).  Pothering further testified that Dr. Moylan oversees all of his work and he was not

accountable to anyone else other than Dr. Moylan. (Doc 74, ¶38). If there were mistakes made, Dr. Moylan would correct those mistakes, in the capacity of a supervisor.  Plaintiff Detweiler confirmed that Dr. Moylan continues to direct and supervise her work.  (Doc 74, ¶43).

With respect to their work as deputy coroner, they were clearly the "personal staff" of the Coroner based upon their work and direct, intimate relationship with the elected coroner of the County.  Importantly, in the most analogous case, Conley, the Court "focus[ed] on the more general question of whether plaintiff worked in an intimate and sensitive position of trust and responsibility." Conley at 454. Here, each of the plaintiffs worked directly for the elected coroner in a highly sensitive and specialized position.  Each of them had interaction with the coroner on a daily basis and he directed their work at all times.  They were the public face and the "eyes" of the Coroner's Office whenever they set foot on a crime scene and the Coroner made sure to make them aware that they represented the elected office in public.

Clearly, the Third Circuit in the underlying Clews Opinion has focused its attention to the closeness of the working relationship between an elected official, within a sensitive position of trust.  (Exhibit 1 at 24).  Further, the appellate court was concerned regarding the "amount of control" that the coroner had over the

deputy coroner positions.  Within the statement of undisputed facts above, it is

certain that Defendant has bolstered and reinforced its position on both of the

concerns returned to this Honorable Court on remand.

It is clear from the undisputed facts gathered initially and on remand that all

three Plaintiffs had a close working relationship with Dr. Moylan and Dr. Moylan

retained all hiring, firing and disciplinary authority over all three plaintiffs.  Dr.

Moylan did not cede and of this authority regarding working conditions or

discipline to his chief deputy, based upon his own testimony and confirming

testimony of both of the County Commissioners.

Based upon the above, this Court should grant the Motion for Summary

Judgment.

**B.    Summary judgment should be granted to the County on Count I of plaintiffs' complaint because, even if they are deemed to be "employees" under the FSLA, plaintiffs have failed to produce any evidence that they are entitled to payment of overtime without resorting to conjecture.**

In an action for unpaid overtime wages in violation of the Fair Labor

Standards Act of 1938, 29 U.S.C. § 207(a)(1) the burden of proof is upon the

employee to establish by a preponderance of the evidence the number of hours of

overtime worked each week and the amount of wages due each pay period, and to

produce evidence sufficient to permit a finding without resorting to conjecture.

Neal v. Braughton, 111 F. Supp. 775, 779 (W.D.Ark. 1953).

Plaintiffs cannot meet their burden based upon the lack of clear evidence of additional unpaid time and/or overtime.  Each of the Plaintiffs, when asked to support their claim for unpaid hours per week, was unable to provide any information without resorting the speculation and conjecture.

Each it is undisputed that each of the plaintiffs' submitted their time entries for payment during their time as deputy coroners.  Each of them developed an estimate of unpaid time and/or unpaid overtime, which has generated this lawsuit. (Doc 74 ¶¶53, 58-59, 63).

When asked during deposition to clarify how he came up with an average of 20 hours per week that were unpaid, Clews was unable to state how he came up with that amount of unpaid time other than "an average for how many calls I handled and how many hours it would be." (Doc 74 ¶55).  He also did not know how much of that average 20 hours would have been recorded and paid versus unrecorded and unpaid.  (Doc 74 ¶¶55).  He conceded that the average of 20 hours per week was an "estimate."  (Doc 74 ¶53).

Plaintiff Detweiler testified that for her alleged 30 hours of unpaid overtime per week for 2.5 years, "the time varies throughout the year, throughout the week, of what comes in.  So it was very – it would be very hard for us to say X amount, so it was an approximate timeframe…".  (Doc 74 ¶65).  While she provided a lengthy list of job duties that she performed on a day to day basis (Doc 74 ¶62),

she was unable to provide any level of certainty regarding which of those job duties were unpaid and conceded that she was speculating regarding her unpaid time.  (Doc 74 ¶65).

Plaintiff Pothering was also asked how he came up with a 30 hour per week of unpaid overtime and testified "I don't—can't answer that."  On the next question, when he was asked whether there was time recorded and not paid, he replied "no".  (Doc 74 ¶59). While he also provided a lengthy list of job duties that he performed on a day to day basis (Doc 74 ¶57), he could not answer how he determined the amount of unpaid time and/or overtime.  (Doc 74 ¶59).

All three plaintiffs, within their testimony as to how they came up with the amount of unpaid time or overtime per week, required the use of speculation or conjecture regarding the amounts of time they allege were unpaid per week. Therefore they cannot meet their burden of proof under the standard in the <u>Neal v. Braughton</u> case and summary judgment should be granted.

    **C.**    **Summary judgment should be granted to the County on Count II of plaintiffs' complaint because plaintiffs have failed to produce any evidence that (1) plaintiffs engaged in protected activity under the FLSA, (2) that the County took adverse employment action against them, and (3) a causal link between any protected activity and employer's adverse action, if any.**

All three plaintiffs have failed to show any evidence that satisfies their prima facie case for retaliatory discharge under the FLSA.  There is no evidence that they engaged in any protected activity.  There is no evidence that there was an adverse

employment action against them.   Finally, even if they were able to prove either or both of the first two elements, there is no evidence connecting any protected activity with any adverse action against any of the three plaintiffs.

 For a claim of unlawful retaliation under the FLSA, the familiar burden-shifting framework from <u>McDonnell Douglas Corp. v Green</u>, 411 U.S. 792 (1973) is utilized.  Under this framework, a plaintiff must first establish a prima facie case by proving:  (1) that he engaged in activity protected under the FLSA; (2) that he subsequently or contemporaneously suffered an adverse employment action; and (3) a causal connection between his protected activity and the employer's adverse action.  <u>Wildi v. Ale-Kiski Med. Ctr.</u>, 659 F.Supp.2d 640,664 (W.D. Pa. 2009).

Within the meaning of the FLSA, protected activity includes "fil[ing] any complaint or institute[ing] or caus[ing] to be instituted any proceeding under or related to [the FLSA]." <u>Jones v. Amerihealth Caritas</u>, 95 F.Supp.3d 807, 814 (E.D. Pa. 2015).   No particular form of complaint is required, as long as a "reasonable, objective person would have understood the employee to have put the employer on notice of an assertion of rights." <u>Kasten v. Saint-Gobain Performance Plastics</u>, 563 U.S. 1, 14 (2011).

A plaintiff must demonstrate that he suffered a materially adverse action. <u>Wildi</u>, 659 F.Supp. 2d at 665.

With respect to the causal link element, two factors are relevant: (1) timing or (2) evidence of ongoing antagonism. Id. at 666. A plaintiff may rely on a broad array of evidence to establish a causal link between his complaints and the materially adverse action. Id.

First, two plaintiffs (Pothering and Detweiler) have advanced no evidence that they suffered an "adverse employment action" as required in any claim for retaliation. In a confusing set of facts, plaintiffs Pothering and Detweiler pled that they were fired on June 1, 2016 (Doc 7, ¶28) and plaintiff Detweiler confirmed this again in her responses to interrogatories (Doc 74 ¶56). Plaintiff Detweiler testified that she was never fired from the Coroner's Office even after her discovery that she was allegedly not paid proper overtime in 2016. (Doc 74 ¶17 ). Plaintiff Pothering conceded he was not separated from employment in June 2016, notwithstanding his allegations contained within the Complaint. (Doc 74 ¶18). Plaintiff Pothering testified he discovered he had unpaid overtime and brought it to Coroner Moylan's attention in 2015. (Doc 74 ¶26). Further, Plaintiff Pothering conceded he worked for the Coroner's office until 2019 and was fired due to "political" differences unrelated to the overtime issue. (Doc 74 ¶19). Therefore, notwithstanding their pleadings, referencing being terminated in June 2016; plaintiffs Detweiler and Pothering admitted during their depositions that they had no separation from employment during 2016 and therefore cannot advance a

retaliation claim on a theory of a "materially adverse action", as they suffered none.

Second, plaintiff, Scott Clews, while confirming that he was separated from employment in June 2016, cannot advance on a theory of retaliation as he conceded that his first conversations, regarding unpaid overtime, with Dr. Moylan, came <u>after his termination</u>. (Doc 74 ¶¶20-23). Therefore, plaintiff Clews admittedly did not engage in any "protected activity" and cannot advance a theory of retaliation.

Even if this Court finds that plaintiff Clews did engage in some protected activity, there is no causal connection between that protected activity and the "adverse employment action" because he was separated from employment prior to making any inquiry into allegations of unpaid overtime.   (Doc 74 ¶¶20-23).

## V.    CONCLUSION

In light of the foregoing and for all the reasons stated in all of the County's papers of record, the County respectfully requests the Court grant its motion for summary judgment and dismiss plaintiffs' complaint in accordance with the proposed order.

Respectfully submitted,

**THOMAS, THOMAS & HAFER LLP**

Date: 05/19/23          By:    /s/ Christopher L. Scott
                               Christopher L. Scott (PA #200976)
                               cscott@tthlaw.com
                               225 Grandview Ave., 5th Floor N
                               Camp Hill, PA 17011
                               717.237.7100 (telephone)
                               717.237.7105 (facsimile)
                               *Attorneys for Defendant*

## CERTIFICATE OF WORD COUNT

In accordance with Local Rule 7.8, the undersigned hereby certifies that Defendant's brief in support of motion for summary judgment includes 4,998 words, irrespective of captions and headings, according to Microsoft Word's word count feature.

**THOMAS, THOMAS & HAFER LLP**

By:    /s/ Christopher L. Scott

## CERTIFICATE OF SERVICE

I certify that on this 19th day of May 2023, a true and correct copy of this

Brief was served via ECF upon the following:

    Edward M Brennan, Esquire
    306 Mahantongo Street
    Pottsville, PA 17901
    emb@attybrennan.com
    *Counsel for Plaintiffs*

               **THOMAS, THOMAS & HAFER LLP**

        By:   /s/ Christopher L. Scott