## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SCOTT CLEWS, *et al.*, | : | Civil No. 3:17-CV-02233 |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| COUNTY OF SCHUYLKILL, | : | |
| | : | |
| Defendant. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

Before the court is the second motion for summary judgment filed by Defendant Schuylkill County ("County"). (Doc. 73.)  Plaintiffs Scott Clews, Joseph Pothering, and Debra Detweiler (collectively, "Plaintiffs") allege that they did not receive compensation for overtime hours that they worked under the Fair Labor Standards Act ("FLSA") and that their jobs as deputy coroners were terminated in retaliation for requesting to be paid overtime.  (Doc. 7.)  County argues that there is no genuine dispute of material fact that Plaintiffs were not entitled to overtime compensation and were not retaliated against.  (Doc. 73.)  For the reasons that follow, the court will grant in part and deny in part Defendant's motion for summary judgment.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

All three Plaintiffs were employed by County as deputy coroners at the same time they were employed in other County positions.  (Doc. 74, ¶¶ 1, 5, 7.)  Plaintiff Scott Clews ("Clews") has been employed by the County as a 911 operator for eighteen years and remains employed as such today.  (*Id.* ¶ 3.)  Clews was also employed as a deputy coroner from 2008 until 2016.  (*Id.* ¶ 2.)  Plaintiff Joseph Pothering ("Pothering") was employed as a 911 operator for twenty-six years until his retirement in 2018.  (*Id.* ¶ 6.)  He was employed as a deputy coroner from 2008 until 2019.  (*Id.* ¶ 5.)  Plaintiff Debra Detweiler ("Detweiler") is currently a certified field appraiser in the tax assessor's office and has been employed as such since 2000.  (*Id.* ¶ 9.)  Detweiler was employed as a deputy coroner from 2014 until 2019.  (*Id.* ¶ 8.)  The elected coroner of Schuylkill County is Dr. David Moylan, M.D. ("Dr. Moylan").  (*Id.* ¶ 12.)  Dr. Moylan took office in January 2012.  (*Id.*)  Former Coroner Joseph Lipsett hired Clews and Pothering, and Dr. Moylan hired Detweiler.  (Doc. 74, ¶ 30.)

---

[1] In considering the Defendant's motion for summary judgment, the court relied on the uncontested facts, or where the facts were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Plaintiffs as the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).  The court also notes that much of this factual background section has already been covered in both the court's prior opinion on summary judgment and the Third Circuit's opinion on appeal.  Where new and additional facts have been presented, the court will note them.

The main job duties of a deputy coroner are being dispatched to the scene of a death, investigating the scene, and then determining a cause of death on the coroner's behalf.  (*Id.* ¶ 10.)  Dr. Moylan or the chief deputy coroner, Dr. Weber, gave instructions for every call.  (*Id.* ¶ 32.)  The deputy coroners would investigate the scene and then report their findings back to either Dr. Moylan or Dr. Weber by telephone.  (*Id.* ¶¶ 32, 49.)  In the deposition taken of Dr. Moylan following remand from the Third Circuit, he testified that he is involved in "just about every case. . . by telephone and if [he's] not available, Dr. Weber handles it."  (Doc. 74-9, p. 32.)[2]  Dr. Moylan testified that the deputy coroners are working with him through telephone conversations when they are out in the field, and the deputy coroners work with Dr. Weber, rather than him, several times a month.  (*Id.*)  All plaintiffs agreed that Dr. Moylan was their direct supervisor.  (*Id.* ¶¶ 31, 37, 43, 45.)  Pothering testified he worked "pretty close" with Dr. Moylan, going over cases on a daily basis.  (*Id.* ¶ 37; Doc. 74-2, p. 14.)  Detweiler testified that from 2014 to 2015, she worked with Dr. Moylan "minim[ally]" but from 2015 through 2017, she worked very closely with Dr. Moylan.  (Doc. 74-3, pp. 12, 13.)  However, since 2017, they rarely speak.  (*Id.* at 13.)  Clews testified that he did not work closely with Dr. Moylan and only talked to him on the phone regarding a cause of death.  (Doc. 74-1, pp. 17, 18.)

---

[2] For ease of reference, the court utilizes the page numbers contained in the CM/ECF header.

Plaintiffs dispute that Dr. Moylan works closely with the deputy coroners in the field.  (Doc. 80, ¶ 47.)  Rather, they contend that chief deputy coroner Dr. Weber worked closely in the field with the deputy coroners.  (*Id.*)  In his deposition post-appeal, Dr. Moylan stated that Dr. Weber is his "main assistant and he helps determine cause and manner of death particularly in the cases of natural causes. He also helps monitor the biweekly payroll, and he advises [Dr. Moylan] on cases with his expertise in internal medicine." (Doc. 74-9, pp. 13, 14.)  Dr. Moylan also testified that Dr. Weber "very, very frequently" works with the deputy coroners and does field investigations."  (*Id.* at 14.)

Dr. Moylan further testified to the closeness of his relationship with Plaintiffs, stating that "Detweiler and Joe Pothering were very active in the day-to-day workings of the county coroner's office."  (*Id.* at 36.)  Dr. Moylan would have "in-depth discussions of the presentations and findings on the scene" with Pothering and Detweiler, and back at the office, they would "talk things over, examin[e] the photographs taken from the scene."  (*Id.* at 37, 38.)  However, Clews "was more or less tied up in the 911 organization most of the time."  (*Id.* at 36.)

The deputy coroners were required to wear "nice attire" and fluorescent vests at the crime scene.  (*Id.* ¶¶ 33, 34, 40.)  They also were required to carry an identification badge, identifying them as employees of the coroner's office at the

crime scene.  (*Id.* ¶¶ 35, 41.)  Dr. Moylan told the deputy coroners that they

represent the coroner's office to the public.  (*Id.* ¶¶ 36, 42, 45.)

The parties also contest the extent of the elected coroner's authority to hire

and fire deputy coroners.  Defendant contends the coroner has "plenary power" to

hire and fire deputy coroners.  (Doc. 74, ¶ 13.)  Plaintiffs contend that the coroner's

power is not "plenary" because the County exercises control over the budget,

maintains employment records, determines the rate and method of pay, and the

number of employees.  (Doc. 80, ¶ 13.)  Further, any hiring decisions made by the

coroner must be approved by the Schuylkill County Salary Board and County

Commissioners.  (*Id.*)  It is, however, uncontested that Dr. Moylan had disciplinary

authority such that he could investigate inappropriate behavior, discuss it with the

deputy coroner, and make appropriate notes in the employment file.  (Doc. 74, ¶

51.)

On June 1, 2016, the County Commissioners' terminated Clews' and

Pothering's employment as deputy coroners.  (*See* Doc. 74, ¶ 15; Doc. 80, ¶ 15.)

The reason for this separation is disputed.  Defendant contends it was because

Plaintiffs' "combination of employment exceed[ed] 40 hours per week."  (Doc. 74,

¶ 15.)  Plaintiffs contend it was "due to federal overtime law" and point to records

from the meeting where a commissioner stated that Clews' and Pothering's

employment was terminated because of federal overtime laws. (Doc. 80, ¶ 15.)[3]

Clews did not return to work as a deputy coroner after June 2016. (Doc. 74, ¶ 20.)

It is disputed whether Pothering's employment was actually "terminated" on this

date, but it is undisputed that Pothering returned to work as a deputy coroner

sometime in 2016 and continued until 2019, when his employment was terminated

due to "political differences." (Doc. 74, ¶ 19.)[4]  Detweiler's employment as a

deputy coroner was not terminated on June 1, 2016, with the other Plaintiffs;

however, she was asked to "stand down" at some point in 2016 or 2017.

---

[3] The notes from this meeting are not in the record currently before the court.  In Dr. Moylan's 2018 deposition, while testifying to the June 2016 meeting minutes, opposing counsel asked: "In this exhibit after you see the votes where they were terminated, it has at the top of the page a reference that Martina Chwastiak [County HR director] explained that they were–worked for the Coroner's Office, etc., etc., and they already had the 40 hours.  We had to terminate them from those jobs in the Coroner's Office.  And then the next sentence says, Commissioner Halcovage informed everyone that this was because of the federal law.  Do you see that?" and Dr. Moylan responds, "I did see it."  (Doc. 74-4, p. 45.)  Further, counsel asks this same question of each County Commissioner deposed and they all verify that the records from the June 2016 commissioner's meeting reflect the same.  (*See* Docs. 79-1, 79-4.)  This specific document utilized at multiple depositions is not in the record before the court in support of County's current motion for summary judgment.  However, because multiple witnesses testified that this was an accurate description of what was recorded in the document, the court will consider the testimonial description of the document as evidence.

[4] The court notes that Pothering contends his employment was terminated in 2016 but he returned to work sometime thereafter.  (Doc. 80, ¶ 18.)  County contends that he was never separated from the coroner's office.  (Doc. 74, ¶ 18.)  In his deposition, Pothering stated that he was separated in June 2016 "due to the overtime purposes" but also that he was not separated at that time and continued on, and then later testified he could not remember any periods of time in 2016 when he was separated from work with the coroner's office.  (Doc. 74-2, pp. 38, 39.)

(Docs. 74, ¶ 17; 80, ¶ 17.)  Despite this request, Detweiler continued employment as a deputy coroner until recently.  (Doc. 80, ¶ 8.)[5]

Clews concedes that he had no conversations with anyone at the County regarding unpaid overtime, and the only conversations he had with Dr. Moylan regarding overtime was after the termination of his employment.  (Doc. 74, ¶¶ 23, 24.)  Plaintiffs contend that Dr. Moylan "knew or should have known that Plaintiff Clews was entitled to overtime and was about to testify in any such proceeding given his advice that Plaintiff Clews should get a lawyer concerning overtime." (Doc. 80, ¶ 22.)  Clews received a payment of $1,200 after the initiation of the instant lawsuit as payment for unpaid overtime.  (Doc. 74, ¶ 25.)  Clews contends that he is entitled to twenty hours of unpaid overtime per week for three years, based on his recollections and his prior time sheets.  (Doc. 74-1, pp. 35, 36.)

Pothering realized he was due overtime sometime in 2015 and brought this to the attention of Charity Conrad in the payroll department.  (*Id.* ¶ 26.)  Pothering received a payment of $5,900 after the initiation of the instant lawsuit as payment for unpaid overtime.  (*Id.* ¶ 27.)  Pothering contends he is entitled to 30 hours of unpaid overtime per week for three years.  Although he kept a log from August 2016 until October 2016, this number is not based on the log that he kept, and he

---

[5] No specific separation date is available from the record, although Plaintiffs contend in their counterstatement of material facts that "[a]s of the date of the Second Motion for Summary Judgment, Detweiler was no longer employed as a deputy coroner."  (Doc. 80, ¶ 8.)

could not answer how he came up with the thirty hours per week number.  (Doc. 74-2, pp. 21–23.)

Detweiler became aware that she was due overtime sometime in 2016 from Plaintiffs Clews and Pothering.  (*Id.* ¶ 28.)  Detweiler received a payment of $3,792 after the initiation of the instant lawsuit as payment for unpaid overtime. (*Id.* ¶ 29.)  Detweiler contends she is entitled to 30 hours per week for three years of unpaid overtime, and she based this estimate on her pay, the number of calls taken, a personal log she kept, and by reviewing the electronic system where the deputy coroners report the calls they handled.  (Doc. 74-3, pp. 25–27.)

Plaintiffs initiated this lawsuit by filing a complaint in the Schuylkill County Court of Common Pleas on November 6, 2017.  (Doc. 1, ¶ 3.)  County then removed it to this court on December 5, 2017.  (Doc. 1.)  Plaintiffs filed the operative amended complaint on January 5, 2018.  (Doc. 7.)  County answered on January 19, 2018.  (Doc. 8.)  On November 12, 2019, both parties moved for summary judgment.  (Docs. 20, 23.)  On May 20, 2020, after full briefing, the court granted County's motion for summary judgment and denied Plaintiffs' motion for summary judgment because Plaintiffs were exempted from FLSA protections due to being personal staff of the coroner.  (Docs. 35, 36.)  Plaintiffs appealed this decision to the Third Circuit Court of Appeals on June 12, 2020. (Doc. 37.)

The Third Circuit reversed and remanded the court's May 2020 order regarding the personal staff exception for further proceedings in light of their opinion.[6]  (Doc. 40.)  Thereafter, the parties proceeded to take further discovery and participate in settlement proceedings.  (Docs. 59, 60.)  After failing to reach a settlement agreement, County moved for summary judgment on May 19, 2023. (Doc. 73.)  The motion is fully briefed and ripe for disposition.

## JURISDICTION AND VENUE

This court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs allege violations of the FLSA, 29 U.S.C. § 201, *et seq.*  The Middle District of Pennsylvania is the proper venue because Schuylkill County is located within the Middle District and all events or omissions giving rise to the claim occurred in this district.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of the dispute "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A

---

[6] This decision will be discussed in depth below.

dispute is genuine if a reasonable trier-of-fact could find in favor of the nonmovant' and 'material if it could affect the outcome of the case." *Thomas v. Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that

there is a genuine issue for trial.  Bare assertions, conclusory allegations, or suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

County argues it is entitled to judgment as a matter of law because Plaintiffs are the coroner's personal staff, and therefore not "employees" as defined by the FLSA.  (Doc. 75, p. 16, 17.)  County further argues that, if Plaintiffs are employees, they have not produced sufficient evidence to establish they are entitled to overtime under the FLSA.  (*Id.* at 17–19.)  Finally, County contends that Plaintiffs have not produced evidence of any element of a retaliation claim. (*Id.* at 19–22.)

Plaintiffs contend that in its opinion, the Third Circuit applied the new test it created and held that there were genuine disputes of material fact precluding summary judgment in this case.  (Doc. 78, p. 1.)  Plaintiffs further contend that the burden to produce evidence regarding their entitlement to specific overtime pay has shifted to the County, due to its failure to properly keep records, and the County has failed to meet this burden. (*Id.* at 15, 16.)  Finally, Plaintiffs contend that they have stated a retaliation claim because Dr. Moylan and the County Commissioners should have known Plaintiffs were entitled to overtime and that Plaintiffs were going to initiate a lawsuit.  (*Id.* at 21.)

The FLSA provides the "federal minimum-wage, maximum-hour, and overtime guarantees that cannot be modified by contract."  *Clews v. Cnty. of Schuylkill*, 12 F.4th 353, 359 (3d Cir. 2021) (quoting *Genesis Healthcare Corp. v. Symcyk*, 569 U.S. 66, 69 (2013)).  Relevant to the instant case, the FLSA requires "employers to compensate employees for hours in excess of 40 per week at a rate of 1 ½ times the employees' regular wages." *Id.* (quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 14, 147 (2012)).  The FLSA's protections only apply to "employees" as defined by the statute. *Id.*  Among those excluded from FLSA coverage are:

> those who work for a state, its political subdivision or an intergovernmental agency, are not subject to civil service laws (that is, are not civil servants under the relevant state laws), *and* fall within one

of several enumerated categories, including those "selected by the holder of [a public elective office] to be a member of his personal staff."

*Id.* (quoting 29 U.S.C. § 203(e)(2)(C)(ii)(II)).  Accordingly, the court will first turn to whether Plaintiffs are "employees" under the FLSA and the Third Circuit's guidance in *Clews.*

### A. The Third Circuit Court of Appeals' Decision in *Clews v. Schuylkill County*

In *Clews*, the Third Circuit developed two "themes" for analyzing whether an employee falls under the personal staff exception.  *Id.* at 361.  These themes are based on the leading case on the personal staff exception, *Teneyuca v. Bexar County*, 767 F.2d 148, 151 (5th Cir. 1985), and the Department of Labor's regulations, 29 C.F.R. § 553.11(b), (c).[7]  *Id.* at 360–61.  The six *Teneyuca* factors are:

---

[7] 29 C.F.R. § 553.11(b) provides "[t]he statutory term 'member of personal staff' generally includes only persons who are under the direct supervision of the selecting elected official and have regular contact with such official. The term typically does not include individuals who are directly supervised by someone other than the elected official even though they may have been selected by the official. For example, the term might include the elected official's personal secretary, but would not include the secretary to an assistant."

Section 553.11(c) provides "[i]n order to qualify as personal staff members or officials in policymaking positions, the individuals in question must not be subject to the civil service laws of their employing agencies.  The term 'civil service laws' refers to a personnel system established by law which is designed to protect employees from arbitrary action, personal favoritism, and political coercion, and which uses a competitive or merit examination process for selection and placement. Continued tenure of employment of employees under civil service, except for cause, is provided. In addition, such personal staff members must be appointed by, and serve solely at the pleasure or discretion of, the elected official."

The court previously held that Plaintiffs were not subject to the civil service laws of Pennsylvania, and the Third Circuit affirmed this determination.  *Clews*, 12 F.4th at 363.

(1) whether the elected official has plenary powers of appointment and removal;

(2) whether the person in the position at issue is personally accountable to only that elected official;

(3) whether the person in the position at issue represents the elected official in the eyes of the public;

(4) whether the elected official exercises a considerable amount of control over the position;

(5) the level of the position within the organization's chain of command; and

(6) the actual intimacy of the working relationship between the elected official and the person filling the position.

*Teneyuca*, 767 F.2d at 151.  Overall, the Third Circuit held that "for an employee to be a member of an elected official's personal staff, 1) the official must work closely with the employee in a sensitive position of trust and confidence, and 2) the official exercises personal control over the employee's hiring, promotion, work conditions, discipline, and termination."  *Clews*, 12 F.4th at 362.

The first theme regards the working relationship between the employee and the elected official (the "closeness" theme).  *Id.* at 362.  To be considered "personal staff" and thus excluded from FLSA protections, the individual "must have a close working relationship with that official, often demonstrated by the official's direct and immediate supervision over personal staff, regular contact between them, and personal staff being trusted to handle sensitive or confidential

information and decisions." This theme corresponds with *Teneyuca* factors 2, 3, 5, and 6. *Id.* at 361–62.

"The second theme involves the official's personal control over the employee's hiring, promotion, work conditions, discipline, and termination." *Id.* at 362. This theme corresponds to *Teneyuca* factors 1, 2, and 4. In evaluating this theme, "courts should first consider whether the elected official (or a predecessor) selected his or her personal staff, as indicated by 29 U.S.C. § 203(e)(2)(c)(ii)(II) of the FLSA (stating the exception for those '*selected*' by the holder of [a public elective office] to be a member of his personal staff." *Id.* (emphasis in original). Courts should also "look to whether the official has power over the employee's termination, and promotion, and exercises considerable control over the manner and conditions of the employee's work." *Id.* (citations omitted.)

The Third Circuit then applied these themes to the facts before them on appeal, which are largely the same facts currently discussed in County's second motion for summary judgment. The Third Circuit found there were factual disputes regarding the closeness of the working relationship between Dr. Moylan and Plaintiffs. The Third Circuit was "not convinced that the Deputy Coroners had a sufficiently close working relationship with Dr. Moylan to be considered his personal staff []" because "[t]he record is mixed as to the amount of regular contact the Plaintiffs had with him, and the Plaintiffs' own deposition testimony was

inconsistent." *Id.* at 363.  Further, the Third Circuit opined that the fact that the coroner's office employed around twenty deputy coroners "undermines the conclusion that Dr. Moylan worked closely with all of them." *Id.* at 364.  Lastly regarding this theme, the Third Circuit decided that, although deputy coroners may represent the coroner to the public, "the record does not clearly show whether Dr. Moylan or Dr. Weber was [the deputy coroner's] more direct supervisor[,]" and that "a jury could conclude Dr. Weber, rather than the Deputy Coroners, was Dr. Moylan's top adviser." *Id.*

The Third Circuit also concluded that there were factual disputes regarding Dr. Moylan's level of control over the Deputy Coroners.  *Id.* at 365.  The Third Circuit found the record unclear on this point because the commissioners discussed the terminations at their meetings, showing that the commissioners' role is more than just a formality.  *Id.*  The Third Circuit also noted that there were no specific findings regarding whether Dr. Moylan set the Plaintiffs' schedule, handled disciplinary matters, or "whether Dr. Moylan or his Chief Deputy exercised greater control and supervision over the Deputy Coroners' work conditions and hours." *Id.*  The Third Circuit concluded that, based on these facts, summary judgment was inappropriate, due to numerous genuine factual disputes.  *Id.*

Since the remand from the Third Circuit, the parties have undertaken further discovery, consisting of further depositions of Dr. Moylan, some County

Commissioners, and the County Administrator.  The court will discuss the additional evidence provided as it relates to each theme, starting with the "closeness" theme.

As explained above, in his post-appeal deposition, Dr. Moylan further explained Dr. Weber's role in the office and their respective relationships with Plaintiffs.  Dr. Moylan testified that Dr. Weber is his "main assistant" who helps determine causes of death, monitors biweekly payroll, and advises Dr. Moylan. (Doc. 74-9, p. 13.)  Dr. Weber would "very, very frequently" work with the coroners and do field investigations.  (*Id.* at 14.)  If Dr. Moylan was away for an extended time, Dr. Weber would assume his duties.  (*Id.*)  Dr. Moylan testified that deputy coroners were never referred to as his "personal staff" and there was no county policy labelling them as such.  (*Id.* at 17, 18.)

Dr. Moylan further testified that he is involved in just about every case and works with the deputy coroners through telephone calls while they are on the scene.  (*Id.* at 32.)  He further testified that the deputy coroners would work with Dr. Weber several times per month.  (*Id.*)  Dr. Moylan testified that he had in-depth discussions with the deputy coroners and discussed each case and examined photographs from the scene.  (*Id.* at 37, 38.)  Dr. Moylan further testified he was in charge of both scheduling and discipline in the office.  (*Id.* at 39.)

These additional facts still leave a genuine dispute of material fact as to Dr. Moylan's relationship with the Plaintiffs and other deputy coroners. The amount of contact that each Plaintiff had with Dr. Moylan remains unchanged, as does the number of deputy coroners in the office. Further, the extent of Dr. Weber's authority is still unclear, as Dr. Moylan testified that Dr. Weber helps with payroll and interacts with the deputy coroners "very frequently." The fact still remains that Dr. Weber is likely Dr. Moylan's top adviser, and the deputy coroners fall somewhere below Dr. Weber. Thus, there is still a genuine issue of material fact as to the closeness of Dr. Moylan's relationship with the deputy coroners.

Turning to the amount of control Dr. Moylan had over the deputy coroners, Dr. Moylan also testified to the role of the County Commissioners in the hiring process. He stated that "[t]he office of the county coroner makes recommendations to hire or fire, and it's reviewed by the County Commissioners and the salary board." (*Id.* at 19.) This process is done through the coroner's office filing a "personnel action request" or "PAR." (*Id.* at 20.) The salary board approves the pay scales, and the County Commissioners vote on the coroner's office's budget. (*Id.* at 21.)

Commissioner Hess also provided some clarity regarding the County's control over these positions. Commissioner Hess testified that the salary board sets the salary for each position and also sets the budget for the coroner's office, but

that hiring is at "the distinction of the coroner," and the coroner is free to allocate his budget.  (Doc. 74-10, p. 21.)  The excerpts of the depositions of Commissioner Halcovage and County Administrator Bender show there was no formal county policy referring to the deputy coroners as Dr. Moylan's personal staff.  (Doc. 79-4.)

While the fact of Dr. Moylan's disciplinary and scheduling control over the deputy coroners was confirmed, the County Commissioners still approve their salaries and hiring, leaving room for a reasonable jury to decide that Dr. Moylan does not exercise "plenary" control over the deputy coroners.  Moreover, while this theme may lean in County's favor, there are still numerous disputed facts regarding the closeness theme.  Therefore, there remain genuine disputes of material fact as to whether Plaintiffs are excluded from FLSA coverage.  Accordingly, in order to resolve the motion, the court will assume Plaintiffs are <u>not</u> personal staff and <u>not</u> exempt from the FLSA and address the merits of their claims.

### B. Merits of Plaintiffs' FLSA Claims

County argues that Plaintiffs have not met their burden of showing they are entitled to overtime because each Plaintiff had to estimate when asked to support their request for a specific number of hours.  (Doc. 75, p. 18.)  Plaintiffs counter that County has the burden to negate the reasonable inference established by

Plaintiffs' estimates because County failed to keep proper records.  (Doc. 78, pp. 15, 16.)

In order to "recover overtime compensation under the FLSA, 'an employee must prove that he worked overtime hours without compensation, and he must show the amount and extent of his overtime work as a matter of just and reasonable inference.'"  *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (quoting *Davis v. Food Lion*, 792 F.2d 1274, 1276 (4th Cir. 1986)).  Typically, when an employer keeps records in compliance with their obligations under 29 U.S.C. § 211(C),[8] an employee can easily meet this burden.  *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 188 (3d Cir. 2014).[9]  However, when an employer fails to meet these obligations, the "burden of any consequent imprecision [in an employee's calculation of damages] must be borne by the employer," and "the employee [is] only required to 'submit sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred.'"  *Id.* (citing

---

[8] 29 U.S.C. § 211(c) provides "[e]very employer subject to any provision of this chapter or of any order issued under this chapter shall make, keep, and preserve such records of the persons employed by him and of the wages, hours, and other conditions and practices of employment maintained by him, and shall preserve such records for such periods of time, and shall make such reports therefrom to the Administrator as he shall prescribe by regulation or order as necessary or appropriate for the enforcement of the provisions of this chapter or the regulations or orders thereunder. The employer of an employee who performs substitute work described in section 207(p)(3) of this title may not be required under this subsection to keep a record of the hours of the substitute work."

[9] The court notes that there is no argument as to whether County properly maintained their records and that there are no timesheets or any other records from the County in the record.

*Anderson v. Mt. Clemens Pottery*, 328 U.S. 680, 687 (1946) (*superseded by statute on other grounds*).  Thus, in a situation where an employer has failed to keep adequate records, once the employee creates a reasonable inference of the amount and extent of the overtime he worked, "the burden shifts to the employer to rebut that inference." *Id.*

While the burden on the employee is low, it is still a burden, and the employee is still required to "prove entitlement to overtime damages." *Id.* at 190, fn.4.  Thus, "calculations based on 'mere speculation' do not provide a basis for relief." *Beccerril v. Spartan Concrete Prod., LLC*, 798 F. App'x 719, 722 (3d Cir. 2020) (citing *Rosano*, 754 at 189.)  "[V]ague and unsubstantiated estimates of the amount of time worked . . . [are] insufficient to satisfy this burden of proof." *Montano v. Allen Harim Foods, LLC*, No. CV 15-392, 2017 WL 3328360, at *12 (D. Del. Aug. 4, 2017), *report and recommendation adopted sub nom. Montano v. Allen Harim Foods, LCC*, No. CV 15-392, 2017 WL 4162177 (D. Del. Sept. 20, 2017).  However, a plaintiff may rely on her own testimony, "so long as in articulating the amount and extent of the work at issue, she can offer[ ] credible testimony *approximating* the number of hours [she] worked without pay." *Id.* (citations omitted) (emphasis in original).

Here, when asked at his deposition how he arrived at the alleged thirty hours of overtime per week, Pothering resorted to mere speculation.  (Doc. 74-2, p. 23.)

Opposing counsel showed Pothering a log he kept from August 2016 until October 2016 and inquired whether he based his estimates on that log, but Pothering answered that he did not and that he could not answer how he came up with thirty hours per week.  (*Id.*)  Accordingly, Pothering has not met his burden of proving entitlement to overtime damages, and summary judgment will be granted for County on Pothering's FLSA claim.

However, the results are different for the remaining two Plaintiffs. Detweiler testified that she based her request of thirty hours per week on a personal log, her pay, the amount of calls taken during the time frame, and also her review of the County's electronic reporting system.  (Doc. 74-3, pp. 26, 27.)  This is sufficient to support a reasonable inference regarding the amount of overtime she worked.  County has provided no evidence to negate this inference.  Therefore, there remains a genuine dispute of material fact as to this claim, and the County's motion for summary judgment regarding Plaintiff Detweiler's FLSA claim will be denied.

Finally, Clews testified that he based his request for twenty hours per week on how many calls he handled and how many hours it would take him to handle those calls.  (Doc. 74-1, p. 35.)  In reaching this estimate, Clews referred to his time sheets.  (*Id.*)  While Clews did testify that he could not say whether these twenty hours were documented and unpaid or undocumented and unpaid, Clews'

reliance on his recollections and his time sheets are sufficient to create a reasonable inference of the amount of overtime he worked.  Again, County has provided no evidence to rebut the reasonableness of this inference.  Thus, there remains a genuine dispute of material fact regarding Clews' FLSA claim, and County's motion for summary judgment on Clews' FLSA claim will be denied.

### C. Retaliation

County argues it is entitled to summary judgment on Plaintiffs' retaliation claim because there is no evidence that any plaintiff engaged in protected activity or suffered an adverse employment action against them.  (Doc. 75, p. 20.) Plaintiffs respond that Moylan knew they were all due overtime and made comments to Clews about getting a lawyer prior to their termination.  (Doc. 78, pp. 16–22.)  Plaintiffs contend that Moylan's knowledge and comment about getting a lawyer should be construed as an informal complaint by Clews.  (*Id.* at 22.) Plaintiffs assert hat Pothering talked to a payroll clerk regarding overtime.  (*Id.* at 17.)  And, Plaintiffs argue that Detweiler became aware of the overtime situation in approximately 2015, and that County did not move for summary judgment regarding Detweiler's retaliation claim.  (Doc. 78, p. 19.)[10]

---

[10] The court rejects this final argument by Plaintiffs, as Detweiler's retaliation claim is discussed in the brief in support, and the motion for summary judgment incorporates the brief in support in its entirety.  (*See* Docs. 73; 75, p. 21.)

The FLSA states, in pertinent part, that "[i]t shall be unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter."  29 U.S.C. § 215(a)(3). An employee may "file" a complaint for purposes of the FLSA by voicing an oral complaint that is "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."  *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011).  To establish a prima facie case of retaliation, a plaintiff must show "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action."  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

While the Third Circuit has not addressed whether informal complaints to supervisors qualify as a protected activity under the FLSA, district courts within the Third Circuit that have considered this issue have determined that, in light of the remedial nature of the FLSA and its liberal construction, it is appropriate to extend protection to informal complaints made to supervisors.  *See, e.g.*, *Jones v. Amerihealth Caritas*, 95 F. Supp. 3d 807, 814 (E.D. Pa. 2015) ("[S]ufficiently

pleading an informal complaint to an employer may qualify as protected activity under § 215(a)(3)"); *Dougherty v. Ciber, Inc.*, No. 04-cv-1682, 2005 U.S. Dist. LEXIS 50529, at *6–9 (M.D. Pa. July 26, 2005) (holding that plaintiff, who was a Human Resources Manager and was terminated after informing her employer that it was not in compliance with the FLSA, was allowed to maintain a retaliation claim because "the phrase 'filed any complaint' affords employees who make informal complaint protection under section 215(a)(3)"); *Coyle v. Madden*, No. 03-4433, 2003 U.S. Dist. LEXIS 23830, at *12–13 (E.D. Pa. Dec. 17, 2003) ("[T]he key to interpreting the anti-retaliation provision is the need to prevent employees' 'fear of economic retaliation' for voicing grievances about substandard conditions."). The language of the statute "contemplates some degree of formality, certainly to the point where the recipient has been given fair notice that a grievance has been lodged and does, or should, reasonably understand the matter as part of its business concerns." *Kasten*, 563 U.S. at 14.

Here, the court finds that no Plaintiff made a complaint to the County regarding unpaid overtime prior to termination of their employment such that the termination of their employment could be considered retaliatory. Turning first to Pothering, the only action he took regarding any unpaid overtime was to speak to a payroll clerk. (Doc. 74-2, pp. 60–61.) There is no evidence in the record that this person was a supervisor or that this person in turn gave notice to the County of the

complaint.  While the County was aware of issues with overtime, there is no

evidence showing Pothering's complaint was the reason the County had this

awareness.  Moreover, even if speaking with a payroll clerk is considered an

informal complaint, there is no causal connection between this action and any

eventual termination of Pothering's employment.  Accordingly, County's motion

for summary judgment on Pothering's retaliation claim is granted.

Detweiler is unable to show that she engaged in any protected activity.

Detweiler argues that she "became aware" she was owed overtime sometime in

late 2015.  (Doc. 78, p.19.)  However, there is no evidence that she expressed this

awareness to the County.  Accordingly, County's motion for summary judgment

on Detweiler's retaliation claim is granted.

Finally, Plaintiff Clews admits that he did not speak with anyone at the

County regarding unpaid overtime until after his termination.  (Docs. 74, ¶ 23; 80,

¶ 23.)  Clews argues that "although Plaintiff Clews did not make a formal

complaint to Defendant, Defendant knew of the likely complaint and testimony,

that Plaintiff Clews was entitled to the overtime and that he was more than likely

about to begin a proceeding or testify in a proceeding under the FLSA."  (Doc. 78,

p. 23.)  Clews bases this argument on the fact that the County knew of overtime

issues and Dr. Moylan told Clews to "get an attorney."  (*Id.* at 21; Doc. 74-1, p.

24.)  However, this comment by Dr. Moylan was made after Clews' employment

was terminated.  (Doc. 74-1, p. 24.)  There is no further evidence in the record that Clews put the County on notice that he was due unpaid overtime prior to his termination.  Accordingly, County's motion for summary judgment will be granted on Clews' retaliation claim.

Overall, Plaintiffs state the "[t]he argument advanced by Defendant is really that in order to be engaged in protected activity under the FLSA, Plaintiffs must have complained or made County aware of the failure to pay overtime prior to the actual adverse action."  (Doc. 78, p. 17.)  This is a correct statement of the law, as the first element of a retaliation claim is that a plaintiff must have engaged in a protected activity.  *Marra*, 497 F.3d at 300.  Accordingly, as no Plaintiff has shown that they engaged in a protected activity putting the County on notice of their FLSA claim, the County's motion for summary judgment will be granted on all Plaintiffs' retaliation claims.

CONCLUSION

In conclusion, County's motion for summary judgment is granted in part and denied in part.  There remains a genuine dispute of material fact as to whether the deputy coroner position is included in the "personal staff" exception under the FLSA.  There also remains genuine disputes of material facts on Plaintiffs Clews and Detweiler's FLSA overtime compensation claim, and summary judgment will be denied on these claims.  There are no genuine disputes of material fact on Plaintiff Pothering's FLSA overtime compensation claim and each Plaintiff's retaliation claim.  Summary judgment will be granted in favor of County on those claims.  An appropriate order follows.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Judge
Middle District of Pennsylvania

Dated: February 23, 2024